## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **IN RE MUTUAL FUNDS INVESTMENT LITIGATION** | : | |
| | : | |
| | : | |
| **ALGER, COLUMBIA, JANUS, MFS,** | : | **CIV. NO. 04-md-15863** |
| **ONE GROUP, PUTNAM, and PIMCO** | : | |
| | : | **The Honorable J. Frederick Motz** |
| | : | |
| **(PUTNAM)** | : | |
| | : | |

| | | |
|---|---|---|
| | : | |
| **PINCHUCK V. COSTER, ET AL.** | : | **CIV. NO. 04-md-00877** |
| | : | |
| | : | |

## VERIFIED AMENDED DERIVATIVE COMPLAINT
## FOR BREACH OF FIDUCIARY DUTY

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      (a)     Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      (b)     Nominal Defendant - Marsh & McLennan . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      (c)     The Director Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      (d)     The Officer Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

KNOWLEDGE OF GENERAL STANDARDS
OF INTERNAL CONTROL AND CORPORATE COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . 10

Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

COSO Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Caremark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Sarbanes-Oxley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Revisions to Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Revised Principles of Federal Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Knowledge Of Internal Control And Compliance Standards Specifically
Affecting Investment Companies And Investment Advisers . . . . . . . . . . . . . . . . . . . . . . . . . 20

Knowledge of MMC's and Putnam's Compliance Systems . . . . . . . . . . . . . . . . . . . . . . . . . 23

The Director Defendants Fully Recognized The Highly
Regulated Environment In Which The Company Operated . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

MARKET TIMING HAS LONG BEEN RECOGNIZED
WITHIN THE INDUSTRY AS A MAJOR PROBLEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Net Asset Value Arbitrage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Arbitrage Activities Cost Long-Term
Mutual Fund Investors  Billions of Dollars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Investment Adviser Companies Face A Clear, Inherent Conflict of Interest . . . . . . . . . . . . . . . 30

Arbitrage Dilution of Mutual Funds Has a Long History . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

The 1981 Putnam No-Action Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

MMC's, Putnam's and The Industry's Heightened Awareness of and
Regulatory Emphasis on Front-Running and Other Improper Trading
Practices by In-House Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

The October 1997 Asian Market Crash and Resultant Outcry . . . . . . . . . . . . . . . . . . . . . . . . . 38

Continued Regulatory and Industry Action Regarding Mutual Fund
Arbitrage Abuses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

   (a)   The December 1999 SEC Letter To The ICI . . . . . . . . . . . . . . . . . . . . . . . 43

   (b)   The April 2001 SEC Letter To The ICI44

The Increase In NAV Arbitrage Abuses In
The Late 1990's And Early 2000's Was Actively
Tracked and Well-Documented in Academic Articles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

The Mutual Fund Industry Has Been Slow To React,
And Has Implemented Policies And Procedures
Designed To Permit Selective Arbitrage Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

MARKET TIMING WAS PREVALENT AT MMC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Improper Market Timing Arrangements With Participants in
Certain 401(k) Pension Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

   (a)   Boilermakers Local Lodge No. 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

   (b)   Joint International Board of Electrical Workers . . . . . . . . . . . . . . . . . . . . . 55

ii

Regulators Eventually Exposed These Market Timing
Arrangements At Putnam and Putnam's Long Standing
Knowledge of Market Timing Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

      (a)      Omid Kamshad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

      (b)      Justin M. Scott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

      (c)      Other Employee Trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Putnam's Internal Controls Were Defective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

BREACHES OF FIDUCIARY DUTY
BY THE DIRECTOR DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

DAMAGES SUSTAINED BY PUTNAM
AND MARSH & McLENNAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

DEMAND FUTILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

COUNT I - Derivative Claim Against The Director
Defendants for Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

COUNT II - Derivative Count Against the Officer
Defendants for Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Plaintiff, by his undersigned attorneys, on personal knowledge as to himself and his acts and on information and belief as to all other matters, based upon an investigation by Plaintiff's counsel, alleges as follows:

## INTRODUCTION

1.     This is a shareholder derivative action brought on behalf of Marsh & McLennan Companies, Inc. (hereinafter, "MMC" or the "Company") for damages caused to MMC by the Individual Defendants' breaches of fiduciary duties owed to MMC and its shareholders.

2.     Previously on September 3, 2003, New York Attorney General Eliot Spitzer announced the settlement of a state civil enforcement action against hedge fund Canary Capital Partners, LLC, its principal Edward J. Stern, and related entities (collectively "Canary") (the "Canary Settlement").  Canary agreed to pay $40 million to settle charges that it had violated New York's anti-fraud statutes by entering into arrangements with numerous mutual fund management companies ("investment adviser companies") granting it special privileges to engage in short-term trading practices that effectively siphoned profits from these mutual funds at the clear expense of long-term investors, who constitute the backbone of the multi-trillion dollar mutual fund industry. The Canary Settlement made clear that the motivation for these investment adviser companies to permit such improper and illegal conduct was simple -- greed -- a the quid pro quo for allowing such short-term trading practices were certain reciprocal practices that resulted in substantially increasing the revenue, profits and fees to the investment adviser companies.

3.     The Canary Settlement revealed that mutual fund management companies entered into long-term and comprehensive arrangements with Canary allowing it to market time specified funds under their stewardship in exchange for Canary's agreement to separately invest or "park" substantial

1

amounts in other investment vehicles managed by the fund adviser, generating millions of dollars in fees to them based on the level of assets under management.

4.      The Canary Settlement proved to be merely the tip of the iceberg.  It has triggered a cascade of other state and federal regulatory investigations and enforcement actions against a large cross-section of mutual fund investment advisor companies.  Shortly thereafter in October 2003, MMC's money management subsidiary, Putnam Investments Management, LLC ("Putnam"), announced that it fired four fund managers for making improper personal trades. Also in October Massachusetts' securities regulars and the SEC filed injunctive actions against two former Putnam managing directors and instituted administrative proceeding against Putnam. These investigations and enforcement actions have revealed a rampant sub-culture within the mutual fund industry that, in effect, permitted certain favored customers the opportunity to skim profits from the funds through market timing and, in the most egregious cases, through blatantly illegal late trading, in return for special arrangements that acted to directly and indirectly increase the fees and profits paid to the investment adviser companies -- all at the expense of the fund's long-term investors.

5.      The SEC, in its settlement agreement with Putnam entered on or about April 8, 2004 (the "SEC Settlement") detailed how the market timing transactions which Putnam permitted it own fund managers and other employees to make, as well as certain privileged customers in various 401(k) pension plans hosted by Putnam,  benefitted those individuals and the company, in breach of their fiduciary duties and to the detriment of investors:

> Beginning in at least 1998, at least six Putnam employees who worked as investment management professionals engaged in excessive short-term trading of Putnam mutual funds in their personal accounts.  Four of those employees engaged in such trading in funds over which they had investment decision-making responsibility and had access to non-public information regarding, among other things, current portfolio

holdings, valuations and transactions not readily available to all fund shareholders. Short-term trading of mutual fund shares can adversely affect mutual fund shareholders because, among other things, it can dilute the value of their shares, raise transaction costs for the fund, disrupt a fund's stated portfolio management strategy, require a fund to maintain an elevated cash position, and result in lost opportunity costs and forced liquidations. Short-term trading can also result in unwanted taxable capital gains for fund shareholders and reduce the fund's long-term performance. Consequently, mutual fund managers such as Putnam, among other things, often maintain policies and procedures to detect and prevent short-term trading.

6.      As alleged in detail below, the boards of directors of the investment advisers were subject to specific fiduciary obligations requiring their active intercession in assuring implementation and adherence to policies and procedures designed to detect and eliminate activity constituting a known risk to the Company. Their personnel, some of whom have also been named as defendants herein, directed or knowingly or recklessly failed to stop the wrongdoing. As the board and employees were well aware, the investment advisers by contract undertook to ensure compliance with regulation and law. These obligations were knowingly and/or recklessly violated for the direct financial benefit of Putnam and Marsh & McLennan.

## JURISDICTION AND VENUE

7.      This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

8.      Plaintiff Warren Pinchuck is a citizen of the state of Florida. Each Defendant who is a citizen of the United States is a citizen of a state other than Florida. Director Defendants Lord Lang of Monkton and Fanjul are not United States citizens. The Nominal Defendant MMC is a Delaware corporation with its principal executive office in New York, New York. The amount in

controversy exceeds $75,000, exclusive of interest and costs.  This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.

9.      This action is not brought collusively to confer jurisdiction on this Court that it would not otherwise have.  Venue is proper in the judicial district in which this action was originally filed – the District of New Jersey – because a substantial part of the wrongful acts alleged herein occurred there or had an impact in that District.  This action was transferred to this judicial district for pretrial purposes pursuant to 28 U.S.C. §1407.

## PARTIES

### a.      Plaintiff

10.     Plaintiff Warren Pinchuck is currently, and has been at all relevant times, the owner of shares of common stock of MMC.

### b.      Nominal Defendant - Marsh & McLennan

11.     The Nominal Defendant MMC is a Delaware corporation with headquarters at 1166 Avenue of the Americas, New York, New York  10036.  MMC, a global professional services firm, is the parent company of various subsidiaries and affiliates that provide analysis, advice and transactional capabilities in the fields of risk and insurance services, investment management and financial consulting.  These services are provided through the Company's three principal subsidiaries as follows: (i) risk and insurance services through Marsh, Inc.; (ii) investment management services through Putnam Investments; and (iii) consulting services through Mercer, Inc.

12.     Putnam is critical to the overall profitability of the Company.  For example, Putnam was responsible for almost $2.2 billion in revenue and $560 million in operating income for MMC

in 2002, constituting 21% and 19%, respectively, of MMC's totals during a year which defendant Lasser (in MMC's 2002 Annual Report) characterized as being a very difficult year for the market.

13.     The day-to-day operations of each of the Putnam Funds is the responsibility of Putnam pursuant to separate management agreements entered into by each fund with Putnam. Putnam is an indirect, wholly-owned subsidiary of MMC.  Putnam provides not only investment management services to the Putnam Funds, but also is responsible for and provides virtually every business function of the funds, including distribution and shareholder services, as well as administrative functions such as compliance with the requirements of the Investment Company Act of 1940 and other applicable laws and regulations.  In exchange for providing such services, Putnam receives a quarterly management fee, calculated as a percentage of the average net assets in the fund during the quarter.

14.     Upon information and belief, Putnam is under the direct control of MMC. The entities, including Putnam Investment Trust, (a holding company that, except for a minority stake owned by employees, is owned by MMC); Putnam LLC (d/b/a Putnam Investments) (a wholly-owned subsidiary of Putnam Investment Trust), and Putnam Management Trust, serve no operational function and play no role in overseeing, managing or directing the conduct and operations of Putnam. As such, oversight and compliance control over management over Putnam rests squarely upon the board of MMC.

**(c)     The Director Defendants**

15.     Each of the following individuals served as a member of the Board of Directors ("Board") of MMC during the period of the wrongdoing alleged herein, and was so serving as of the date of the filing of the original complaint in this action:

5

16.     Defendant Peter Coster ("Coster"), a citizen of New York, is President and Chief Executive Officer of Mercer, Inc., and an Executive Officer of MMC.  He has served as a director of MMC since 1988.  In 2003, Coster received total compensation from MMC, including from Mercer, of over $2.6 million.

17.     Defendant Charles A. Davis ("Davis"), a citizen of New Jersey, is Vice Chairman of MMC and Chairman and Chief Executive Officer of MMC Capital, Inc., an indirect subsidiary of MMC.  He is an Executive Officer of MMC, and a director of MMC since 2000.  Before joining MMC, Davis worked at Goldman, Sachs & Co. in numerous positions, including Head of Investment Banking Services Worldwide.  In 2003, Davis received total compensation from MMC, including from Mercer, of over $3.2 million.

18.     Defendant Gwendolyn S. King ("King"), a director of MMC since 1998, has served as a member of both the Board's Audit, and Directors and Governance Committees. She is a citizen of the District of Columbia.

19.     Defendant Lawrence J. Lasser ("Lasser"), a citizen of Massachusetts, joined Putnam in 1969, and served as its President and Chief Executive Officer until his November 3, 2003 resignation.  Lasser also served as a trustee of approximately 100 of Putnam's managed mutual funds.  In addition, Lasser also served as an Executive Officer of MMC.  Lasser was a director of MMC from 1987 until November 3, 2003.  During his last five years at MMC and Putnam, Lasser's salary and bonuses exceeded $100 million, making him one of the most highly compensated executives in the mutual fund industry.

6

20.     Defendant David A. Olsen ("Olsen"), a citizen of New York, served as Vice Chairman of MMC during 1997, and has been a director of MMC and a member of the Board's Audit Committee since 1997.

21.     Defendant Lewis W. Bernard ("Bernard"), a citizen of New York, retired after 30 years at Morgan Stanley & Co., Inc., where he held, among other positions, that of Chief Administrative and Financial Officer.  He has been a director of MMC since 1992, and a member of Board's the Executive and Compensation Committees.

22.     Defendant Mathis Cabiallavetta (Cabiallavetta"), a foreign national residing in New York, is Vice Chairman of MMC since 1999, and a director of MMC since 2000.

23.     Defendant Robert F. Erburu ("Erburu"), a director of MMC since 1996 and a member of the Board's Compensation, and Directors and Governance Committees.  He is a citizen of California.

24.     Defendant Oscar Fanjul ("Fanjul"), a director of MMC since February 2001, has served as a member of the Board's Audit Committee.  Fanjul serves on MMC's International Advisory Board and is a director of Marsh SA, a Spanish subsidiary of MMC.  He is a citizen of Spain.

25.     Defendant Ray J. Groves ("Groves"), a citizen of Virginia, has been a director of MMC since 1994, was named senior advisor to MMC in August 2001, and became President and Chief Operating Officer of Marsh Inc. in October 2001.  Prior to joining MMC, Groves was Chairman of Legg Mason Merchant Banking, Inc., a position he held since 1995.  In 1994, Groves retired from Ernst & Young, where he had held numerous positions for 37 years, including the last 17 years as Chairman and Chief Executive Officer.  Groves has also served as a director of American

Water Works Company, Inc., Boston Scientific Corporation, and Electronic Data Systems Corporation.

26.     Defendant Jeffrey Greenberg ("Greenberg"), a citizen of New York, New Jersey, or Connecticut, is Chairman of the Board and Chief Executive Officer of MMC, having joined the Company in 1995.  Greenberg has been a director of MMC since 1996, and serves as the chairman of the Executive Committee.

27.     Defendant Stephen R. Hardis ("Hardis"), a director of MMC since 1998, has served as a member of the Board's Executive and Audit Committees.  He is a citizen of Ohio.

28.     Defendant The Rt. Hon. Lord Lang of Monkton ("Lord Lang"), a director of MMC since 1997, has served as a member of the Board's Executive, Compensation, and Directors and Governance Committees.  He is a subject of the United Kingdom.

29.     Defendant Morton O. Schapiro ("Schapiro"), a director of MMC since 2002, has served as a member of the Board's Audit Committee.  He is a citizen of Massachusetts.

30.     Defendant Adele Simmons ("Simmons"), a director of MMC since 1978, has served as a member of the Board's Executive and Audit Committees.  She is a citizen of Illinois.

31.     Defendant A.J.C. Smith ("Smith"), a director of MMC since 1977, has also served as Chairman of the Board of MMC between 1992 and 2000.  Smith was also Chief Executive Officer of MMC from 1992 through 1999 and, since June 1, 2000, has an agreement with MMC pursuant to which he consults with and advises MMC and serves as a trustee of various Putnam mutual funds. Smith in 2003 was appointed Chairman of Putnam Investments.  He also serves as Chairman of MMC's International Advisory Board, a director of Marsh & McLennan Risk Capital Holdings Ltd. and MMC Capital.  Smith is a citizen of New York.

(d)      **The Officer Defendants**

32.     Omid Kamshad ("Kamshad"), a citizen of Massachusetts, was chief investment officer for international equity at Putnam since early 2002.  During the relevant time period, Kamshad was also a portfolio manager for at least seven mutual funds whose portfolios contained international securities.  By virtue of his position at Putnam, Kamshad had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions. In breach of his fiduciary duty, and with access to such non-public information, between 1998 and 2003, Kamshad engaged in at least 38 "round trip" trades of Putnam funds, including at least four funds over which he exercised direct and/or indirect management and control.

33.     Justin M. Scott ("Scott"), a citizen of Massachusetts, was Chief Investment Officer of the International Equities Group at Putnam.  During the relevant time period, Scott was a portfolio manager for at least five mutual funds whose portfolios contained international securities.  Like Kamshad, by virtue of his position at Putnam, Scott also had access to material non-public portfolio information.  Between 1998 and 2000, Scott engaged in approximately 35 round trip trades in Putnam funds, including funds over which he exercised direct and/or indirect management and control.

34.     Kamshad and Scott are at times referred to collectively hereinafter as the "Officer Defendants."  The Officer Defendants and Director Defendants are collectively referred to as Individual Defendants.

**KNOWLEDGE OF GENERAL STANDARDS**
**OF INTERNAL CONTROL AND CORPORATE COMPLIANCE**

35.     As sophisticated business people with extensive financial services industry and executive managers in publicly traded companies, the Director Defendants were each aware of fundamental concepts of internal control as applied to complex business organizations, as well as of the importance of adequate and effective systems to assure corporate compliance with applicable laws and regulations.

36.     Although issues of internal control and corporate compliance had received extensive congressional, regulatory, industry and public attention in the 1970s and 1980s, in the early 1990s, two developments directly pertaining to organizational governance clearly and unambiguously established the crucial responsibilities of corporate directors in these critical areas.

**<u>Sentencing Guidelines</u>**

37.     First, pursuant to the Sentencing Reform Act of 1984, in 1991 the United States Sentencing Commission adopted the Organizational Sentencing Guidelines (the "Sentencing Guidelines").  The Sentencing Guidelines set forth a uniform structure for sentencing organizations for violations of federal criminal statutes, creating powerful incentives for corporations to have in place effective compliance programs, and establishing minimum criteria for evaluating such programs.

38.     The Sentencing Guidelines have garnered wide-spread support and recognition. Delaware law specifically recognizes, in the context of defining the oversight duties of corporate directors, that in order to attend in good faith to their fiduciary responsibilities, directors must take into account the Sentencing Guideline standards for corporate compliance programs.

39.     Among the minimum criteria for an effective compliance program under the

Sentencing Guidelines are:

- standards and procedures to be followed by employees and other agents that are reasonably capable of reducing the prospect of illegal conduct;

- assignment of overall responsibility to oversee compliance with such standards and procedures to high-level personnel:

- utilization of monitoring and auditing systems reasonably designed to detect illegal conduct by employees and other agents;

- having in place a reporting system whereby employees and other agents could report illegal conduct without fear of retribution;

- consideration of the likelihood that certain offenses may occur because of the nature of the company's business;

- consideration of the prior compliance history of the company; and

- ensuring that the company's compliance program incorporates and follows standards called for by any applicable government regulation.

40.     These explicit criteria support the common-sense proposition that directors, in

performing their compliance oversight function, must satisfy themselves that the corporation's

compliance program is appropriately designed to address the compliance risks arising from the

nature of company's business and its specific compliance history, and must ensure that the company

employs a system of monitoring and auditing that will provide them with reasonable assurance that

the compliance program is in fact operating effectively.

**COSO Framework**

41.     Second, in 1992, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") published "Internal Control -- Integrated Framework," ("COSO Framework")  which provides a broad framework of criteria against which companies can evaluate the effectiveness of their internal control systems.  The COSO Framework became the basis for many existing rules, regulations and laws, and, most recently, was recognized by the SEC (in its final rule regarding Management's Reports on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, IC-26068) as the only currently existing internal control evaluation criteria satisfying the SEC's evaluative standard requirement applicable in the United States.

42.     Highly relevant to the degree of respect and deference given to the COSO Framework was the expansive and multi-disciplinary nature of the input, review and assessment reflected in its creation.  Specifically, the COSO Framework was the product of a process that solicited the views of a broad base of corporate executives, legislators, regulators, academics and auditors.  In addition, an exposure draft was widely released, and comments were received, considered and processed in arriving at the final version.

43.     The COSO Framework defines internal control as "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" in three categories: (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.  COSO further states that internal control consists of five components:

- *Control Environment* -- The core of any business is its people -- their individual attributes, including integrity, ethical values, and competence -- and the environment in which they operate. They are the engine that drives the entity and the foundation on which everything rests.

- *Risk Assessment* -- The entity must be aware of the risks it faces. It must set objectives, integrated with the sales, production, marketing, financial and other activities so that the organization is operating in concert.

- *Control Activities* -- Control policies and procedures must be established and executed to help ensure that the actions identified by management as necessary to address risks to achievement of the entity's objectives are effectively carried out.

- *Information and Communication* -- Surrounding these activities are information and communication systems. These enable the entity's people to capture and exchange the information needed to conduct, manage and control its operations.

- *Monitoring* -- The entire process must be monitored, and modifications made as necessary. In this way, the system can react dynamically, changing as conditions warrant.

44. The COSO Framework contains separate chapters addressing each internal control component. Each chapter concludes with a section concerning evaluation of the effectiveness of the relevant internal control component and gives illustrative examples of key inquiries to be made by the evaluator. Highlights of these illustrative examples include:

- *Control Environment* -- To what extent is there pressure to meet unrealistic short-term performance targets and to what extent is compensation based on achieving them? To what extant is the board or audit committee independent of management? To what extent is sufficient and timely information provided to the board or audit committee?

- *Risk Assessment* -- Are mechanisms to identify risks arising from external sources adequate? Are mechanisms to identify risks arising from internal sources adequate? Is the risk analysis process, including estimating the significance of risks, assessing the likelihood of their occurring and determining needed actions, adequate?

13

- *Control Activities* -- Have appropriate policies and procedures been designed and implemented relative to the risks identified and assessed in the risk assessment process?

- *Information and Communication* -- Is information provided to the right people in sufficient detail and on time to enable them to carry out their responsibilities efficiently and effectively? Have channels of communication been established for people to report suspected improprieties?

- *Monitoring* -- Are internal audit activities effective? Is the entity responsive to internal and external auditor recommendations on means to strengthen internal controls?

45.     Most importantly, the COSO Framework recognizes that: "an active and involved board of directors . . . possessing an appropriate degree of management, technical and other expertise coupled with the necessary stature and mind set so that it can adequately perform the necessary governance, guidance and oversight responsibilities . . . is critical to effective internal control." One key environmental factor that creates a temptation for employees to engage in improper acts is "[a]n ineffective board of directors that does not provide objective oversight of top management." Moreover, "an unassertive or ineffective board or audit committee can provide opportunities for indiscretions."

46.     The COSO Framework also states that the duty of a company's CEO, who has "ultimate ownership responsibility for the internal control system," is to ensure that "all of the components of internal control are in place," and that "the CEO [is] ultimately accountable to the board." The board itself must satisfy itself that the internal control system is reasonably designed and operates effectively. The COSO Framework states that "[e]ffective boards and audit committees [must] determine whether the internal control system has the necessary critical underpinnings," that

14

"[m]embers of the board should discuss with senior management the state of the entity's internal control system[,] provide oversight as needed[, and] seek input from the internal and external auditors," and that the "audit committee, in conjunction with or in addition to a strong internal audit function, is often in the best position within an entity to identify and act in instances where top management overrides internal controls or otherwise seeks to misrepresented reported financial results."

47.     The COSO Framework further provides that:

Management is accountable to the board of directors or trustees, which provides governance, guidance, and oversight.  By selecting management, the board has a major role in defining what it expects in integrity and ethical values, and can confirm its expectations through its oversight activities.  Similarly, by reserving authority in certain key decisions, the board can play a role in high-level objective setting and strategic planning, and with the oversight that the board provides, the board is involved pervasively in internal control.

Effective board members are objective, capable, and inquisitive.  They have working knowledge of the entity's activities and environment and commit the time necessary to fulfill their board responsibilities.  They should utilize resources as needed to investigate any issues they deem important, and have an open and unrestricted communications channel with all entity personnel, including the internal auditors, and with the external auditors and legal counsel.

48.     One of the basic concepts set forth in the COSO Framework -- and perhaps the most crucial in terms of highlighting the necessity of active involvement and oversight by a company's directors -- is that internal controls may be circumvented by management:

The term "management override" is used here [in the COSO Framework] to mean overruling prescribed policies or procedures for illegitimate purposes with the intent of personal gain or an enhanced presentation of an entity's financial condition or compliance status.  . . .  [A]ctions to override usually are not documented or disclosed, with an intent to cover up the actions.

15

49.     Thus, the COSO Framework repeatedly emphasizes the critical importance of the role of directors, functioning in an audit committee or as the full board, in conjunction with a strong internal audit function, to identify and act in instances where top management overrides internal controls.  It identifies management override as one instance in which the "audit committee or board must carry its oversight role to the point of directly addressing serious events or conditions."

**Caremark**

50.     Additionally, the decision of the Delaware Court of Chancery in In re Caremark International, Inc. Derivative Litigation, Del. Ch., 698 A.2d 959 (1996) further focused attention of corporate legal advisers, commentators and directors on the compliance oversight responsibilities of corporate boards.  In that decision, the Court of Chancery opined that within the general legal and regulatory framework affecting public company's in 1996, a corporate board has responsibility to assure that management has established information and reporting systems to provide senior management and the board with material information concerning the corporation's compliance with applicable statutes and regulations:

> I note the potential impact of the federal organizational sentencing guidelines on any business organization.  Any rational person attempting in good faith to meet an organizational governance responsibility would be bound to take into account this development and the enhanced penalties and the opportunities for reduced sanctions it offers.

51.     Thus, by 1996, directors of Delaware corporations were on plain notice that performance of their fundamental duty of good faith required that management had established a reasonably designed and effectively operating corporate compliance system, and that this compliance system was designed to, and could be expected to, provide the board or an appropriate committee

16

with sufficient, timely and accurate information to enable them to fulfill their oversight responsibilities.

**Sarbanes-Oxley**

52.     In the wake of the 2001 Enron collapse, issues of internal control and compliance -- and particularly, the responsibilities of corporate directors with respect to these matters -- has received renewed and intense legislative, regulatory, industry and public scrutiny.   A Senate investigation into the Enron situation led to publication of a July 2002 report laying a significant part of the blame for the Company's collapse on the failure of the directors to take appropriate action to address known risks.  This report led to enactment of the Sarbanes Oxley Act of 2002.

53.     Among the Sarbanes Oxley Act's key provisions include:

•       Requiring companies to establish an Audit Committee of the Board, consisting entirely of independent directors.

•       Requiring companies to disclose the name of at least one Audit Committee member who is a "financial expert," or to publicly explain why the committee includes no such member.[1]

•       Requiring officers signing annual and quarterly reports to certify, among other things, that they have disclosed to the Audit Committee all significant deficiencies in the design or operation of the company's internal controls which could adversely affect the company's ability to record process summarize and report financial data, as well

---

[1]       The SEC's final rules regarding this requirement, effective March 3, 2003, define the term "audit committee financial expert" as having all five of the following attributes: (i) Understands GAAP and financial statements; (ii) Can apply GAAP to estimates, accruals and reserves; (iii) Has personal experience or has supervised those with experience in preparing, auditing, analyzing or evaluating financial statements of a breadth and complexity comparable to the breadth and complexity of the company's financial statements; (iv) Understands internal controls and financial reporting procedures; and (v) Understands audit committee functions.

as any fraud, material or not, that involves management or other employees who have a significant role in the company's internal controls.

- Requiring each annual report to contain an internal control report stating the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting and containing an assessment, as of the end of the most recent fiscal year, of the effectiveness of the internal control structure, which assessment must be attested to by the company's independent auditor in connection with its audit report.

These provisions make clear that federal law directly places upon directors of public companies a duty to actively oversee internal controls.

**Revisions to Sentencing Guidelines**

54.     Other regulatory and law enforcement action since 2001 has clearly emphasized director responsibility for oversight of compliance programs.   For example, revisions to the Sentencing Guidelines, to be effective November 1, 2004 address the role of the organization's "governing authority" -- in most cases, a board of directors -- in an effective compliance program:

The organization's governing authority shall be knowledgeable about the content and operation of the program to prevent and detect violations of law and shall exercise reasonable oversight with respect to the implementation and effectiveness of the program to prevent and detect violations of law.

Specific individual(s) within the high level personnel of the organization shall be assigned direct, overall responsibility to ensure the implementation and effectiveness of the program to prevent and detect violations of law.   Such individual(s) shall be given adequate resources and authority to carry out such responsibility and shall report on the implementation and effectiveness of the program to prevent and detect violations of law directly to the governing authority or an appropriate subgroup of the governing authority.

55.     These revisions were intended to *clarify the already-existing* compliance responsibilities of: (i) members of the governing authority; (ii) executive leadership; and (iii)

18

individuals having primary responsibility for the compliance program. Explaining the revised standard, the Advisory Group wrote:

> [T]he current total silence in the organizational sentencing guidelines relating to the role of the governing authority fails to state what may otherwise be obvious: ultimately the governing authority is responsible for the activities of the organization. It can only perform this function if its members are actively involved in compliance reviews and reasonably educated about the business of the organization and the legal and fiduciary duties of governing authority members.

**Revised Principles of Federal Prosecution**

56.     In January 2003, the Justice Department issued a revised Principles of Federal Prosecution of Business Organizations. Like the original principles issued in 1999, these revised principles list the existence of an effective corporate compliance program as an important consideration for prosecutors in making charging decisions. However, the revised principles go far beyond the original principles in emphasizing the responsibility of directors to oversee a corporate compliance program, making explicit reference to the Caremark case.

57.     The revised principles list as questions the prosecutor may consider:

•       Do the corporation's directors exercise independent review over proposed corporate actions rather than unquestioningly ratifying officers' recommendations?

•       Are the directors provided with information sufficient to enable the exercise of independent judgment? and

•       Have the Directors established an information and reporting system in the organization reasonably designed to provide management and the board with timely and accurate information sufficient to allow them to reach an informed decision regarding the organization's compliance with the law?"

19

58.     Recognizing that all these reforms are relevant to the issue of a director's good faith, former Delaware Chief Justice Norman Veasey, in prepared remarks to the National Association of Corporate Directors on October 21, 2003, stated:

> [B]oards should be told that it is arguable -- but not settled -- that the issue of good faith may be measured not only by the evolving expectations of directors in the context of Delaware common law fiduciary duty, but it also may well be neasyred against the backdrop of relevant Sarbanes-Oxley SEC Rules and the SRO requirements. . . . That is, when and if these reforms are presented as part of a board's conduct in a Delaware court where that conduct is relevant, adherence to these reforms may be relevant and would be advisable.

59.     Clearly, in light of all the aforementioned focus on internal controls and compliance, the good faith of directors must be measured in the context of specific facts bearing upon their conduct, and, for directors responsible for the governance of publicly traded companies in the United States, the general regulatory environment within which they operate includes, among other things, the Sentencing Guidelines, Sarbanes Oxley and related regulations and SRO listing rules, as well as best practices in internal control founded upon the COSO Framework.  Clearly, shareholders in publicly traded companies have a right to expect that directors will take into account these laws, regulations, and rules relating to company governance.

**Knowledge Of Internal Control And Compliance**
**Standards Specifically Affecting Investment**
**Companies And Investment Advisers**

60.     Not only were the Director Defendants aware of the above enunciated internal control and compliance standards affecting public companies in general, but they were also aware, as detailed herein, that every aspect of Putnam's investment advisory business is subject to pervasive regulation, and they were further aware that the SEC is Putnam's principal federal regulator.

Numerous federal securities statutes and regulations administered by the SEC and applicable to investment advisors make clear the importance of effective compliance programs.  For example:

- Section 203(e)(6) of the Advisers Act [15 U.S.C 80b-3(e)(6)] provides that a person shall not be deemed to have failed to supervise any person if: (i) the adviser had adopted procedures reasonably designed to prevent and detect violations of the federal securities laws; (ii) the adviser had a system in place for applying the procedures; and (iii) the person had reasonably discharged his supervisory responsibilities in accordance with the procedures and had no reason to believe the supervised person was not complying with the procedures.

- Rule 206(4)-6 under the Advisers Act [17 CFR 275.206(4)-6] requires investment advisers to adopt and implement written policies and procedures that are reasonably designed to ensure that the adviser votes proxies in the best interest of clients. Similarly, funds must disclose the policies and procedures that they use to determine how to vote proxies relating to portfolio securities. Form N-1A, Item 13(f) [17 CFR 239.15A; 274.11A]; Form N-2, Item 18.16 [17 CFR 239.14; 274.11a-1]; Form N-3, Item 20(o) [17 CFR 239.17a; 17 CFR 274.11b]; and Form N-CSR, Item 7 [17 CFR 249.331; 17 CFR 274.128].

- Section 204A of the Advisers Act [15 U.S.C. 80b-4a] requires each adviser registered with the SEC to have written policies and procedures reasonably designed to prevent the misuse of material non-public information by the adviser or persons associated with the adviser. Rule 17j-1(c)(1) under the Investment Company Act [17 CFR 270.17j-1(c)(1)] requires a fund and each investment adviser and principal underwriter of the fund to "adopt a written code of ethics containing provisions reasonably necessary to prevent" certain persons affiliated with the fund, its investment adviser or its principal underwriter from engaging in certain fraudulent, manipulative, and deceptive actions with respect to the fund.

- Moreover, under 31 CFR 103.130(c), funds must develop an anti-money laundering program, which includes the establishment and implementation of "policies, procedures, and internal controls reasonably designed to prevent the mutual fund from being used for money laundering or the financing of terrorist activities and to achieve compliance with the applicable provisions of the Bank Secrecy Act and the implementing regulations thereunder."

61.    In addition to the various regulations set forth above, which are examples of specific substantive areas in which investment advisers are called upon to have in place effective systems of

internal control and compliance, the SEC further made clear in a 2001 accounting and auditing release concerning the "Relationship of Cooperation to Agency Enforcement Decisions" that effective systems of corporate compliance could have a significant effect on SEC enforcement decisions.

62.   The consequences of inadequate compliance programs -- and particularly of failing to have in place a compliance monitoring structure independent of the underlying business line activity -- were likewise well publicized through SEC releases regarding enforcement actions. See e.g., Millennium Capital Advisors, Investment Advisers Act Release No. 2092 (Dec. 13, 2002) (unauthorized trading in client account and concealment of this trading were facilitated by adviser's vague and insufficient compliance procedures and absence of independent monitoring of portfolio manager); Gintel Asset Management, Investment Advisers Act Release No. 2079 (Nov. 8, 2002) (repeated improper cross trades, principal transactions, and personal trading resulted in part from inadequate procedures to prevent violation of the adviser's code of ethics); Back Bay Advisors, Investment Advisers Act Release No. 2070 (Oct. 25, 2002) (excessive reliance on self-reporting and self-monitoring by portfolio managers to determine whether the firm was in compliance with the federal securities laws resulted in improper cross-trades); Western Asset Management, Investment Advisers Act Release No. 1980 (Sept. 28, 2001) (subadviser had not established adequate procedures to detect portfolio manager's fraudulent activities with respect to the purchase and pricing of private placement securities); Scudder Kemper Investments, Investment Advisers Act Release No. 1848 (Dec. 22, 1999) (adviser did not have in place procedures that could have prevented and detected trader's unauthorized trading for investment company accounts); Rhumbline Advisers, Investment Advisers Act Release No. 1765 (Sept. 29, 1998) (absence of procedures enabled chief investment

officer to engage in unauthorized trading and to misrepresent resultant losses); Kemper Financial Services, Investment Advisers Act Release No. 1494 (June 6, 1995) (adviser had no guidelines or procedures in place to address conflicts of interest and funds' portfolio manager misappropriated funds' investment opportunity on behalf of private profit-sharing plan he also managed).

63.    In what now appears to have been a starkly prescient understatement, the SEC observed in a February 2003 Release that not all firms registered with it have adopted and implemented adequate compliance programs.  As demonstrated herein, this was surely true with respect to MMC, and for this failure, the Director Defendants are responsible.

**Knowledge of MMC's and Putnam's Compliance Systems**

64.    MMC's 2002 and 2003 Proxies stated that the Audit Committee:

> assists the Board in fulfilling its oversight responsibilities with respect to (i) the annual financial information to be provided to stockholders and the Securities and Exchange Commission ("SEC"); (ii) *the system of internal controls that management has established*; and (iii) *the internal and external audit process.*

Emphasis added.

65.    MMC's March 2003 Proxy also stated that the Governance Committee was responsible for the development, review and periodic reassessment of MMC's corporate governance principles, as well as the recommendation of proposed changes to the Board.

**The Director Defendants Fully Recognized The Highly
Regulated Environment In Which The Company Operated**

66.    The importance of assuring legal and regulatory compliance to the Company's continued operations was clearly spelled out in repeated Company public filings with the SEC,

particularly the Form 10-K -- a critical document reviewed and approved by the Board each year

before its public dissemination, and signed by the Director Defendants.  For example, MMC's 2001

and 2002 Forms 10-K stated that:

> The activities of MMC are subject to licensing requirements and extensive regulation
> under the laws of the United States and its various states, territories and possessions,
> as well as laws of other countries in which MMC's subsidiaries operate.  These laws
> and regulations are primarily intended to benefit clients and mutual fund investors.

67.     These Forms 10-K further demonstrated the Board's full awareness of the crucial

importance of adequately monitoring and overseeing changes in the regulatory environment:

> MMC's three business segments depend on the validity of, and continued good
> standing under, the licenses and approvals pursuant to which they operate, as well as
> compliance with pertinent regulations.  MMC therefore devotes significant effort
> toward maintaining its licenses and to ensuring compliance with a diverse and
> complex regulatory structure.

68.     In addition, these Forms 10-K provided specifically with respect to Putnam that:

> Putnam's securities investment management activities are subject to regulation in the
> United States by the Securities and Exchange Commission ("SEC"), and other
> federal, state and self regulatory authorities and in the United Kingdom by the
> Financial Services Authority, as well as in certain other countries in which it does
> business.

69.     Reflecting the Board's recognition of the highly adverse consequence MMC could

face should MMC fail to implement adequate and appropriate compliance oversight and control

systems, the Forms 10-K also provided:

> In all jurisdictions the applicable laws and regulations are subject to amendment or
> interpretation by regulatory authorities.  Generally, such authorities are vested with
> relatively broad discretion to grant, renew and revoke licenses and approvals, and to
> implement regulations.  Licenses may be denied or revoked for various reasons,
> including the violation of such regulations, conviction of crimes and the like.
> Possible sanctions which may be imposed include the suspension of individual

employees, limitations on engaging in a particular business for specified periods of time, revocation of licenses, censures, redress to clients and fines.

70.     Despite their repeated public assurances regarding the nature and scope of the compliance oversight and control systems in place at MMC, however, as detailed herein, at least a majority of the Director Defendants breached their fiduciary duties by intentionally or recklessly permitting or acquiescing in the institution and perpetuation of facially inadequate and defective oversight and compliance control systems at MMC.

## MARKET TIMING HAS LONG BEEN RECOGNIZED
## WITHIN THE INDUSTRY AS A MAJOR PROBLEM

71.     As detailed herein, because share valuation for mutual funds is done, not on an on-going basis like stocks, but rather only once a day, it has long been a well-recognized fact among regulators and the industry that this structure creates a substantial risk for abuse by arbitrageurs, to the detriment of long-term investors.  There is a long history of Congressional and regulatory action taken based on this reality, and public filings by mutual fund companies themselves frequently tout the procedures and practices allegedly in place to protect their investors from such risks.

### Net Asset Value Arbitrage

72.     The term "market timing" describes the practice of making frequent purchases and corresponding redemptions of mutual fund shares to exploit well-documented inefficiencies in the way such shares are priced.  Instead of being continuously priced by market trading transactions, mutual fund shares are priced once a day, typically at the 4 p.m. close of market trading, at their pro rata share of the fund's total net asset value ("NAV").  NAV is set based on the last traded price of each security held by the fund, except when market prices are not readily available.  Thus, for orders

received prior to 4 p.m. on a given business day, the price will be the NAV calculated at 4 p.m. that day.  For orders received after 4 p.m., the price will be the NAV calculated at 4 p.m. the next day. (Rule 22c-1 promulgated by the SEC).

73.     This pricing system creates a clear and well-documented arbitrage opportunity.  For many types of assets held by mutual funds, the most recent trading price does not fully reflect all available market information.  In other words, the prices are stale.  The most obvious examples are international stocks that trade on overseas exchanges that close up to 15 hours before the 4 p.m. Eastern Standard Time (EST) close of U. S. markets.  Thus, arbitrageurs will track short-term shifts in overseas and U.S. markets, and make market timed trades to capture resulting profits.  As an example to explain this practice:

> DAY 1 - Overseas:  overseas markets perform poorly, with stock prices declining. Overseas markets close and prices are set before U.S. markets even open.

> DAY 1 - in the U.S.: because of poor performance in overseas markets, mutual funds that trade in such securities will record a decline in NAV.  However, U.S. market perform well.  Prior to 4:00 p m. EST, an arbitrageur buys shares in a mutual fund that trades in overseas stocks -- knowing that the NAV to be set for that purchase at 4:00 p.m. that afternoon will reflect the poor performance overseas earlier that day. The arbitrageur makes this purchase based on the well-documented fact that foreign markets tend to follow U.S. market performance, and thus, the depressed overseas markets would be expected to react favorably tomorrow to today's strong trading on U.S. markets.

> DAY 2 - Overseas:  the overseas markets, as anticipated, react favorably to the strong trading in U.S. markets, and share prices, which declined the prior day, rebound.  The arbitrageur turns around and sells his mutual fund shares, capturing the short-term profit that will be reflected in the increased NAV set at 4:00 p.m. on DAY 2.

74.     The arbitrage described in the above example is not perfect, since the trader is still exposed to the risk that <u>after</u> the purchase on DAY 1, the overseas markets on DAY 2 do not react

favorably to the strong U.S. market performance. The trader can seek to hedge this exposure through selected options and/or futures transactions. This exposure can further be reduced by "late trading," a term which describes the illegal practice of purchasing shares <u>after</u> the 4:00 p.m. EST (<u>i.e.</u>, with knowledge of events that occur following the setting of the NAV), but still getting those shares at that day's NAV, rather than the next day's NAV, as required by law.

75.     Similar arbitrage strategies can be practiced in mutual funds that invest in other asset classes that exhibit stale pricing within the mutual fund pricing system, including small-cap stocks, high-yield bonds, and convertible bonds. These asset classes often trade infrequently, and have wide bid-ask spreads, frequently resulting in the most recent trade price being systematically different from the price that would prevail in a liquid market.

**Arbitrage Activities Cost Long-Term**
**Mutual Fund Investors  Billions of Dollars**

76.     While only capturing small price differentials by systematically employing such arbitrage strategies, traders can extract enormous cumulative returns over time. According to an October 2002 academic article, entitled "Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds," Professor Eric Zitzewitz of the Stanford Graduate School of Business (the "Zitzewitz Article") found:

> Arbitrageurs who buy international funds on days the S&P 500 has risen and sell them on days it has declined can earn uncompounded excess returns of 35 percent per year; refinements to the trading strategy can double these returns. The arbitrage returns available in domestic small-cap and convertible and high-yield and convertible bond funds are smaller but still substantial, at 20-25 percent and 10-25 percent, respectively.

27

77.     The profits taken by short-term traders utilizing these arbitrage strategies come directly from the pockets of long-term mutual fund investors on a dollar-for-dollar basis.  This result, called "dilution" of the mutual fund, can be illustrated by the following highly-simplified example:

Without a Market Timer:

DAY 1 --  Fund has 10 outstanding shares, owned one share each by 10 investors, and a prior day NAV of $100; with each share thus redeemable at a price of $10.

DAY 2 -- the value of the Fund's assets increase 15%, resulting in a new NAV at the end of business on DAY 2 of $115; with each share now being redeemable for $11.50.  Each current shareholder thus has earned a return (on paper) of 15%.

With A Market Timer:

DAY 1 -- same as above, except that Trader purchases 1 share for $10.00.

DAY 2 -- The Fund's new NAV, including the 15% gain on underlying assets and the additional $10 share purchase price (which has not yet been invested in any assets, and thus, will not itself generate any profit to the Fund), is now $125.  If Trader redeems his share on Day 2, his redemption price will be $11.36 ($125 total value of Fund divided by the 11 outstanding shares), and the Fund's total NAV after the redemption will be $113.64.  Thus, instead of sharing equally the 15% gain, and having a Fund share value of $11.5 on DAY 2, the Fund's original ten long-term investors now have a Fund share value of only $11.36 at the close of business on DAY 2.  The 14 cents per share dilution to the Fund has been skimmed by the market timer.

78.     Empirical research has established that the dilutive effect of market timing exists and is substantial.  For example, the Zitzewitz Article "present[ed] evidence from a sample of funds that suggests long-term shareholders are losing about $5 billion per year across all asset classes" to systematic market timing.  Professor Zitzewitz further observed that this dilution of long-term shareholder value had "grown rapidly in the last four years."

28

79.     Dilution of long-term shareholder value is not the only harm caused by market timing. Frequent and substantial in and out trading in mutual funds by market timers imposes burdensome transactional costs on the target funds.  These costs may include sales of portfolio securities to cover large redemptions, or the cost of stand-by funds to cover such redemptions.  When a fund must execute trades to cover timer redemptions, it may be forced to realize capital gains at an undesirable time, or to sell stock into a falling market.  To the extent that a portfolio manager elects to keep cash on hand to cover timer redemptions, the fund may suffer from cash/investment allocation that diverges from what otherwise would be optimal.

80.     The potentially substantial adverse effects of market timing on a mutual fund are both well-documented and well-known by regulators and the industry.  In fact, as part of their inducement to potential investors, many mutual fund prospectuses set forth a litany of measures they have allegedly adopted to identify and preclude such practices.  For example, most mutual funds state that they reserve the right to decline purchase orders; and some specifically state in their fund prospectus that this right may be exercised to decline purchases from investors who exhibit a pattern of trading that appears to be designed to take advantage of short-term market movements.

81.     Illustrative of these representations, the February 4, 1994, prospectus for the Asia Pacific Growth Fund (which merged into the Putnam International Equity Fund in 2002) stated that:

> The exchange privilege is not intended as a vehicle for short-term trading.  Excessive exchange activity may interfere with portfolio management and have an adverse effect on all shareholders.  In order to limit excessive exchange activity and in other circumstances where the Trustees or Putnam Management believes doing so would be in the best interests of the Fund, the Fund reserves the right to revise or terminate the exchange privilege, limit the amount or number of exchanges or reject any exchange.

82.     Over time, many funds also limited the number of round-trip trades that an investor can make within a defined period, for example, four round trips in one year.  In addition, many funds focusing on foreign stocks impose a short-term redemption fee of 1 to 2%, seeking to discourage arbitrage trading.

83.     For example, since at least January 2000, Putnam's prospectuses, such as for the Putnam International Voyager Fund now known as Putnam International Capital Opportunities Fund ("Voyager fund"), have contained the language similar to the following regarding exchanges of mutual fund shares:

> The exchange privilege is not intended as a vehicle for short-term trading.  Excessive exchange activity may interfere with portfolio management and have an adverse effect on all shareholders. In order to limit excessive exchange activity and otherwise promote the best interest of the fund, the fund imposes a redemption fee of 1.00% of the total exchange amount (calculated at market value) on exchanges of shares held less than 90 days.  The fund also reserves the right to revise or terminate the exchange privilege, limit the amount or number or exchanges or reject any exchange. The fund into which you would like to exchange may also reject your exchange. These actions may apply to all shareholders or only to those shareholders whose exchanges Putnam Management determines are likely to have a negative effect on the fund or other Putnam funds.

**Investment Adviser Companies Face**
**A Clear, Inherent Conflict of Interest**

84.     Typically, a single investment adviser company sets up a number of mutual funds to form one or more family of funds.  For example, Putnam Investment Management is the manager for an entire array of mutual funds (see ¶**, infra).  While each mutual fund is in fact its own company, as a practical matter the investment adviser company operates and controls it.  The investment adviser company, either directly or through affiliated entities, provides: (i) portfolio management, (ii) marketing and distribution, and (iii) other administrative functions, including back

office operations and compliance.  Thus, the portfolio managers who make the investment decisions for the funds, the administrators who run the back office and perform compliance functions, and the executives to whom they report are all typically employees of the same investment adviser company, and <u>not</u> the mutual funds themselves.  This structure creates a clear potential conflict of interest between the funds (and their investors) and the investment managers.

85.     This inherent structural conflict of interecst has long been recognized by the industry, regulators and legislators.  In a statement before the Senate Governmental Affairs Subcommittee on Financial Management, the Budget, and International Security on January 27, 2004, John P. Freeman, Professor of Law, University of South Carolina Law School stated:

> **<u>The Fund Industry's Moral Compass is Broken; Conflicts of Interest are Rampant.</u>**  The fund industry's hallmark is its external management set-up by which an outside company manages the fund while populating a number of seats on the fund's board, including the Chairman's seat.  The external manager typically controls all facets of fund life, from the fund's incorporation through the selection of the initial board.  Historically, this control has tended not to be relinquished over time.

> *     *     *

> The fund industry's structure thus features a built-in conflict of interest; *it creates and perpetuates the risk, always, that the manager will treat fund shareholders unfairly.*

86.     Former SEC Commissioner David Ruder, in his testimony before the Committee on Banking, Housing, and Urban Affairs of the United States Senate on February 26, 2004 regarding mutual fund reform, directly highlighted the crux of this structural conflict of interest:

> When a mutual fund investor entrust funds to an investment adviser, conflicts inevitably arise. The adviser seeks to maximize their profits, while the fund shareholders want the adviser to charge the lowest fees possible. *Conflicts also exist because the adviser who has control over investors' money may engage in*

31

*transactions with the fund that are to the advantage of the adviser and to the detriment of investors.*

Emphasis added.

87.     This inherent and manifest conflict of interest creates heightened compliance risks for mutual fund management companies.  Therefore, these fiduciaries have a heightened duty to design and implement compliance policies and procedures which ensure that fund managers are not finding ways to profit personally in a manner detrimental to the interests of, and unfair to, mutual fund investors who entrust their savings to these companies.

88.     As detailed herein, the market timing scandal was a product of the clear failure on the part of the directors, officers and management of a large number of investment adviser companies -- with full knowledge and/or conscious disregard of the inherent conflicts of interest and obvious red flags highlighted by regulators, academicians and the general press over many years -- to take reasonable, adequate and appropriate compliance oversight action.

**Arbitrage Dilution of Mutual Funds Has a Long History**

89.     The market timing scandal recently revealed by the Canary Settlement and subsequent events represents a prime example of precisely the type of heightened compliance risk, born of the inherent conflict of interest that characterizes the mutual fund industry, that appropriately designed and implemented compliance programs at the fund management companies must detect and prevent. Professor Mercer Bullard, a former SEC Investment Management Division attorney, in his November 3, 2003 testimony before the Senate Subcommittee on Financial Management, the Budget and International Security, testified that:

32

The alleged frauds in [the market timing and late trading scandal], however, were open and notorious and violated express legal requirements. *Fund stewards were on notice and failed to take action.* There are no significant legal loopholes to close or grounds to excuse a fundamental failure of compliance. These systemic frauds have exposed a compliance system that is not working and is in dire need of structural reform.

* * *

The[se] frauds . . . represent a systemic compliance failure in the fund industry. *Each of these frauds reflects a failure to ensure that there are compliance procedures in place that are reasonably designed to protect shareholders, and that steps are taken to ensure that the procedures are working.* None of these frauds is surprising in the sense that the fraud reflects an unknown vulnerability in the operation or regulation of mutual funds. *Each of these frauds was predictable and could and should have been prevented simply by enforcing minimal compliance standards.*

Emphasis added.

90.     In 1940, Congress adopted the Investment Company Act ("the 40 Act"). One of the primary goals of the 40 Act was to seek to eliminate the opportunity for insiders to trade fund shares at prices that differ from their true value, and thus diluting the interests of long term mutual fund security holders.

91.     Following passage of the 40 Act, most mutual funds processed transactions at the most recent prior-computed NAV. This fact allowed speculators to transact at prior day NAV's on days that the market had moved significantly. In 1968, the SEC again acted, this time adopting Rule 22c-1 to protect long–term mutual fund investors from the dilutive effects of such speculative trading. Rule 22c-1 requires forward pricing of mutual fund share sales and redemptions.

92.     The SEC's forward pricing rule sought to eliminate an obvious loophole that encouraged a relatively unsophisticated form of arbitrage -- mutual fund trading based on already-published, and obviously stale, NAV's.

**The 1981 Putnam No-Action Letter**

93.     The SEC's adoption of Rule 22c-1 did not eliminate speculative short-term trading in mutual fund shares or the dilution it caused.  While the forward NAV pricing required by Rule 22c-1 made purchasing mutual fund shares based on a prior-computed and announced NAV impossible (absent illegal conduct such as late trading), arbitrageurs still recognized multiple opportunities to profit from stale pricing effects inherent in the procedures used to value mutual fund shares, i.e., due to time zone differences or limited liquidity.

94.     Ironically, it was Putnam itself that was responsible for the SEC issuing a critical No-Action Letter that directly supported a mutual fund's application of fair value pricing to combat market timing.  Specifically, Putnam, on behalf of two of its international funds, sought advice from the SEC  regarding its proposed practice of calculating NAV's using local closing prices on all days except if "some extraordinary event were to occur after the close," which could result in that market's closing prices to "no longer [be] a reasonable estimate of such securities' values as of 4:00 p.m."  The SEC's response, approving Putnam's use of fair value pricing, issued in a No-Action Letter dated February 23, 1981, put the mutual fund industry again, on notice of the potential risks for arbitrage resulting from stale pricing, especially with mutual funds that traded in overseas securities.

95.     Although the 1981 Putnam No-Action Letter allowed Putnam and other investment adviser companies to "fair value" the assets of the funds under their management if they concluded that local market closing prices did not reasonably reflect current market value as of 4:00 p.m. EST, in practice, fair value pricing was applied extremely rarely.  Thus, arbitrageurs could and did

continue to actively target mutual funds, focusing on securities traded on overseas exchanges for speculative trading.

**MMC's, Putnam's and The Industry's Heightened**
**Awareness of and Regulatory Emphasis on**
**Front-Running and Other Improper Trading**
**Practices by In-House Personnel**

96.     MMC, Individual Defendants and Director Defendants have had a long history of notice of pervasive personal trading practices by Putnam fund managers and other personnel that directly breached their fiduciary duties.  For example,  The Wall Street Journal, in an article dated August 14, 1997, entitled "Putnam Suit Spotlights Personal Trades," reported that:

> A legal skirmish between Putnam Investments and a former staff attorney for the big, Boston-based mutual-fund company has opened a window onto the murky world of personal trading by fund managers.

> The lawsuit, filed originally in Massachusetts Superior Court in Boston and later transferred to a federal court there, was brought by Edward A.H. Siedle, a former Putnam chief of compliance.  It is essentially a breach-of-contract dispute involving his contentious departure from Putnam in 1988.

> The suit also charges, however, that during the late 1980s, some senior fund managers at Putnam asked colleagues to hold off on trades for clients so that the managers could complete trades in the same stocks for themselves. These allegations raise issues of "front running," an illegal practice.  When front running, a money manager seeks to profit personally as the firm's massive buying power eventually pushes up the price of a stock he bought previously.

> Moreover, a series of internal Putnam memos unrelated to the lawsuit allege a senior investment manager engaged in a slew of personal-trading violations in 1988 and ultimately was penalized by his superiors.  The matter was never submitted to the Securities and Exchange Commission, which regulates the industry.

97.     At this time, concerns over personal trading by fund managers was an increasingly important issue with both regulators and the industry.  The Wall Street Journal article went on to state:

> In the past few years, the $4 trillion industry has begun to restrict personal trading by fund managers as money has continued pouring into mutual funds at record levels. Because fund firms don't publicly disclose their managers' personal trades, however, it is difficult to determine just how fruitful such efforts at limiting conflicts-of-interest have been.

98.     The issue of front running and personal trading by fund management personnel in breach of their fiduciary duties became a "hot topic" with regulators, and thus with the industry, in 1994.  The Wall Street Journal article continued:

> Government regulators and fund companies stepped up their scrutiny of personal trading by fund managers in 1994 after the firing of Invesco Funds' star portfolio manager, John Kaweske, for violating the company's rules on personal trading. (Invesco is now part of Amvescap PLC.)

> That year, a "blue-ribbon" industry panel issued a set of personal-trading restrictions, and in the years since the Kaweske incident, the Securities and Exchange Commission and some other fund companies, including Putnam, have punished other prominent fund managers for personal-trading violations.

> Certainly, under federal securities laws, investment advisers -- including fund managers -- have long been held to exacting standards of fiduciary responsibility that ban conflicts-of-interest with clients -- including in the manager's personal investments.

> "Your duty to your client should come before personal interests," says Janet Olsen, a fund lawyer at Bell, Boyd & Lloyd in Chicago. "To put a client in a position where the client might be disadvantaged violates your duty. Most of the time, advisers attempt to fulfill their duties by having clients go first" in trades.

Moreover, the SEC requires mutual-fund companies to write, distribute and enforce a code of ethics governing such issues as personal trading and conflicts of interest.

99.     The article further noted that "excessive" personal trading practices by at least one

fund manager was well documented at Putnam at this time:

According to the internal memos, over the course of three months in 1988, Thomas O'Neill, then a Putnam money manager, made 176 personal trades. That is an unusually high number, Putnam officials acknowledge, even for that pre-Kaweske era.

In some cases, according to the memos, Mr. O'Neill bought stocks in advance of Putnam clients, at lower prices than the clients paid. In other cases, he bought highly volatile options on stocks that Putnam was buying for clients, the memos say. Regulators watch options trades closely because small movements in the price of an underlying stock can lead to huge profits for options investors.

One memo says that in eight instances, Mr. O'Neill traded in stocks despite having been refused clearance by Putnam's legal department. The memo does not, however, allege that Mr. O'Neill sought his colleagues' cooperation in his activities.

100.    Defendant Lasser was fully aware of these issues, and of the facts of Mr. O'Neill's

misconduct:

Mr. Lasser doesn't dispute the details contained in the memos about Mr. O'Neill's personal-trading issues and acknowledges that Putnam took action against Mr. O'Neill for personal-trading activities. Mr. Lasser says that he acted quickly to discipline Mr. O'Neill and that clients weren't harmed by Mr. O'Neill's personal trading.

A memo indicates that as reprisal for his actions, Mr. O'Neill was restricted to 20 personal trades for 30 days. He was also asked to join a Putnam committee to rewrite the firm's code-of-ethics.

Mr. Lasser says his response, "considered in the context of the time and our history," was "profoundly severe." He says the punishment "led to serious questions as to

37

whether this man could continue with Putnam because of his embarrassment at being identified and so uniquely censured."

Mr. Lasser says that despite the trading issues, he ultimately viewed Mr. O'Neill as "absolutely honest." Mr. O'Neill voluntarily left Putnam in 1991.

101.    Best demonstrating the difference between what Putnam *said* and what Putnam *did*

with respect to pervasive trading practices by fund management personnel, Lasser was quoted in The

Wall Street Journal article as claiming:

Should a similar incident arise today, Mr. Lasser says, his response would be more severe. "If something equivalently extreme happened [today], that person could not work here."

102.    As detailed herein, not only did "something equivalently extreme," namely repeated

egregious and internally well-documented market timing trading by fund management personnel,

often in the very funds they managed, continue to happen over a multi-year period, Lasser and others

at Putnam and Marsh & McLellan not only permitted such employees to continue to work at the

Company, they also took no action to even require those employees to forfeit their ill-gotten profits.

**The October 1997 Asian Market Crash and Resultant Outcry**

103.    The risks and consequences of timed trading and market arbitrage burst onto the

regulatory and general press forefront again, this time in connection with an Asian market crash in

October, 1997.  On October 28, 1997 the Hong Kong market closed down 14%, while later that same

day, the S&P 500 rose 6.1% on U.S. market trading.  Since Hong Kong's market closes six hours

prior to the opening of the U.S. market, the closing prices of Hong Kong stocks did not reflect the

fact that the U.S. market had surged.

104.    Some funds maintained standard fund share pricing procedures and did not factor the strong performance by the U.S. market into their valuation of the Hong Kong stocks in their portfolios.  Fidelity, however, invoked the concept of fair value pricing, and incorporated this fact (and its likely positive affect on Hong Kong stock prices) into its share valuation.  T. Rowe Price likewise effectively used fair value pricing by waiting until the Hong Kong Market opened on October 29th before evaluating the NAV for funds including such stocks.  Other funds that failed to factor into their fund valuation pricing the expected rebound effect that the strong the U.S. market performance would have on the value of their Hong Kong shares in essence allowed speculative investors to purchase shares of their funds with Hong Kong holdings at prices substantially below their true current value.

105.    Much to the dismay of the arbitrageurs in the Fidelity and T. Rowe Price funds, by implementing fair value pricing, these two firms effectively acted to protect long-term investors in the foreign funds under their management.  Arbitrageurs who had invested in these funds but were unable to profit from stale pricing complained loudly, asserting that they were unaware that the management companies could deviate from using the stale local market closing prices to set the fund NAV's.  These complaints led to an SEC investigation.  The SEC concluded that Fidelity had acted properly.  In a December 4, 1997 speech to the Investment Company Institute ("ICI") (an industry group comprising approximately 95% of mutual fund management companies) gathering, the SEC's Director of Investment Management, Barry Barbash, stated:

> Taken as a whole, the results of our recent exams and disclosure reviews have convinced us that we need to undertake a broader and more comprehensive analysis of fund pricing issues. We have decided to make such an analysis a priority of the investment management division for 1998.

39

As part of our review, we will look closely at the procedures funds follow in pricing their shares and will consider whether we should fine-tune some of our rules and current interpretations relating to pricing.

106.    The Wall Street Journal further reported on December 5, 1997:

"Funds that use fair-value pricing in this context appear to better protect longterm shareholders," Mr. Barbash said in an interview.  "That's what our findings show."

                                        *    *    *

In fact the SEC examination of fair-value pricing has turned up a number of interesting findings, including the extent to which investors speculated in mutual-fund shares during October's market turbulence.  These market timers complained to the SEC that they didn't know that their fund companies could use fair value pricing; many said they lost money in the process.

But Mr. Barbash said the commission believes fair-value pricing succeeds in upholding one of the commission's public policy goals--protecting long-term investors from speculators who can "dilute" the holdings of those who stay with the funds through thick and thin.  In effect, short-term traders who pile into a fund on a price dip, then bail out as soon as the price recovers, skim off some of the profits that would have been realized by longer-term investors.

Mr. Barbash also said that the speculators who said they were caught off guard would have known about fair value if only they read their fund's disclosure documents.  Mr. Barbash said the review found that fund companies did disclose that they can turn to fair value when they see fit.  He added that some of the explanations were too legalistic, but they were there nonetheless.

107.    On December 18, 1997, The Wall Street Journal, in an article entitled "Market Timers

Beware," reported:

A number of mutual-fund companies, fearing a new wave of speculative trading the next time global markets wobble, are taking steps to thwart those investors who seek to capitalize on market gyrations.

One step is expanding the use of "fair-value pricing" for fund shares -- a controversial pricing system in which fund companies come up with share prices by using information other than the closing market price of stocks in their portfolios.  Other

fund companies say they will simply refuse to take orders from customers they suspect to be market timers, while another group is lobbying the giant fund supermarkets to help their cause.

Why all the concern? During the market correction of late October, a number of fund companies found themselves at the mercy of mutual-fund market timers, who spotted a profitable short-term investment because of the time differences between overseas and U.S. markets.

The timers were able to buy Asian funds on the cheap, knowing full well that these shares would rise after the U.S. markets began to recover, and then selling those shares for a quick profit. While timers are able to profit whenever there is a time difference between markets, the magnitude of the problem first became apparent in October.

Fund companies say the market timers earned a quick profit at the expense of the funds' long-term shareholders by diluting the holdings of those investors who hang on through thick and thin. The Securities and Exchange Commission, the fund industry's top cop, agrees and is looking at ways fund companies can best protect themselves and their customers against timers. Barry Barbash, SEC director of investment management, says the SEC may ultimately "bless a number of pricing methods" and will make some recommendation on the matter in 1998.

Several fund companies concede they were caught off guard by the immense amount of speculative trading in late October. They are looking to take action before the next big market move.

Of course, some firms, like giant Fidelity Investments, protected themselves by employing fair-value pricing of fund shares during the late October correction. As a result, many of the speculators and other investors didn't know that they actually purchased Asian fund shares at a higher price -- based on what Fidelity thought was the "fair value" of stocks in its funds. Fidelity based the prices on such information as trading of futures tied to the stocks, rather than their closing prices on the Asian markets.

Officials of Harris Associates, the manager of the Oakmark funds, have been on a campaign to weed out market timers. David Herro, manager of Oakmark International Fund, says his fund, with assets of about $1.7 billion, has turned away potential investors who wanted to put almost $100 million to work. "The firm has seen more short-term trading in recent weeks," says William Nygren, Harris's director of research. "In volatile markets, the timers are more active."

But other fund companies did nothing, only to discover that the market timers had won out. One such fund group, Guinness Flight Investment Management, observed that some timers took advantage of its China & Hong Kong Fund, buying shares priced on the decline of Asian market at a time when the U.S. markets were rebounding. The next day, when the Asian markets did indeed recover, as they often do after a rise in the U.S. markets, some investors sold their shares for a quick profit.

108.    Thus, at a minimum, the result of the wide-spread and well-publicized market timing that occurred in connection with the October 1997 Asian market crash, and the ensuing SEC investigation, findings and general press coverage left the entire mutual fund industry aware that: (i) arbitrageurs targeted mutual funds holding assets exhibiting stale pricing, such as funds investing in stocks trading on an overseas exchange; (ii) permitting such speculative trading in mutual fund shares harmed long-term investors by diluting the fund NAV; (iii) a highly effective method of preventing such arbitrage was available and permissible under the regulations extant at that time; and (iv) the industry's principal regulator, the SEC, had decided to focus attention on these issues.

**Continued Regulatory and Industry Action**
**Regarding Mutual Fund Arbitrage Abuses**

109.    Pursuant to its initial investigation of the event surrounding the crash, the SEC had stated that fair value pricing was "permitted, but not required." The SEC "clarified" this position in December 1999 and April 2001 letters to ICI. These letters constitute yet another red flag, of which directors of companies with significant operations in the investment advisory business, either were aware of, or absent reckless indifference, should have been aware of, indicating substantial compliance risk in connection with arbitrage opportunities arising from the stale pricing of fund assets.

a.      **The December 1999 SEC Letter To The ICI**

110.    In its December 8, 1999 letter to the ICI, the SEC reiterated that the 40 Act's pricing requirements "are critical to ensuring that the prices at which fund shares are purchased and redeemed are fair, and do not result in dilution of shareholder interests or other harm to shareholders." This letter observed that the 40 Act requires mutual funds to value their portfolio securities by using the market value of the securities when market quotations for the securities are readily available; however, when such quotations are not readily available, funds must otherwise arrive at a determination of the fair value of the securities.

111.    The SEC used the September 1999 Taiwan earthquake, which resulted in the closing of the Taiwan exchange for a number of days, as an illustration of circumstances when market quotations of certain securities were not readily available. The SEC thus determined that "funds should consider adopting procedures that are designed to alert the board and fund management to conditions that may necessitate fair value pricing of portfolio securities."

112.    The SEC recognized the reality that it was the investment adviser firm, and not the mutual fund itself, that acted as "fund management," with day-to-day responsibility for operations, including setting share prices. Thus, despite the fact that the 40 Act places the responsibility to set a fair value for portfolio securities on the fund board, the December No-Action Letter stated: "Mutual fund boards, however, typically are only indirectly involved in the day-to-day pricing of a fund's portfolio securities," and that most fund "boards fulfill their obligations by reviewing and approving pricing methodologies, which may be formulated by the [fund] board, but more typically are recommended and applied by fund management."

43

b.    **The April 2001 SEC Letter To The ICI**

113.    In its April 30, 2001 letter to the ICI, the SEC issued a much stronger statement regarding both the need for fair value pricing and the inherent risks of dilution and injury to long-term investors posed by fund arbitrageurs. The April 2001 letter directly addressed the time zone arbitrage problem, and found that failure to apply fair value pricing following an event significant enough as to possibly affect the accuracy of local market closing prices could result in fund dilution. The SEC specifically stated that "funds should continuously monitor for events that might necessitate the use of fair value prices." The SEC further stated that, with respect to securities traded on foreign exchanges, "a fund must evaluate whether a significant event (i.e., an event that will affect the value of a portfolio security) has occurred after the foreign exchange or market has closed, but before the fund's NAV calculation."   The SEC further recognized this same problem can exist regarding fair value pricing of relatively illiquid securities.

114.    Finally, the SEC attached as an exhibit to the April 2001 No-Action letter a hypothetical example of how using accurate fair value pricing could completely eliminate the arbitrage opportunity resulting from stale pricing of foreign portfolio securities, thus protecting long-term fund investors from dilution.

115.    The SEC's illustrative example highlighted beyond dispute that: (i) the SEC considered market timing by arbitrageurs to be dilutive and injurious to long-term investors in mutual funds; and (ii) fund management (i.e., the investment adviser companies responsible for setting share prices and ensuring compliance with laws and regulations) were required to practice fair market pricing in order to eliminate arbitrage opportunities that result from stale market pricing

practices.  In addition, the SEC also provided the mutual fund industry with a clear and explicit road map detailing exactly how to prevent the entire problem of market timing.

**The Increase In NAV Arbitrage Abuses In The**
**Late 1990's And Early 2000's Was Actively Tracked**
**and Well-Documented in Academic Articles**

116.    Over the same period that the SEC was undertaking repeated investigations and issuing its findings regarding market timing and arbitrage abuses in the mutual fund industry, extensive study and analysis by numerous academicians were also being publicized and widely disseminated which arrived at exactly the same findings and conclusions.

117.    On May 3, 2004, The Wall Street Journal published an article entitled "Discovering Profits in Timing Funds," which noted:

> [A] small group of academics had pointed out the potential problems with market-timing strategies for years.  Since the late 1990s, more than a dozen finance professors at numerous universities have done research to document how market timing works and how it hurts mutual-fund investors.  Prompted more by academic curiosity and professional competition than by investor advocacy, the researchers working alone and in small teams wrote at least eight papers on the topic.  All were published or widely circulated well before questions about the fund-timing issues attracted Mr. Spitzer's attention beginning last summer.

118.    These academic studies, while heightening both SEC and industry awareness of the market-timing problem, ironically, led to increased market timing activity as more arbitrageurs became aware of the arbitrage opportunities available.  The May 3 article went on to state:

> [W]hen Mr. Dubofsky jointly wrote a second paper on market timing in 2001, he and co-author Rahul Bhargava from the University of Nevada at Reno got several dozen calls from interested parties asking for copies of the study.  But the calls didn't come from regulators - they came from sophisticated investors who wanted to learn more about how to trade mutual funds.

45

119.    Professor Zitzewitz, in his October 2002 article "Who Cares About Shareholders" (quoted above), listed well-publicized academic studies concerning mutual fund market timing:

> Several academic papers have discussed NAV predictability and the associated arbitrage opportunity: Bhargava, Bose, and Dubofsky (1998), Chalmers, Edelen, and Kadlec (2001), Goetzmann, Ivkovic, and Rouwenhorst (2001), Greene and Hodges (2002), and Boudoukh, Richardson, Subrahmanyam, and Whitelaw (2002). These papers focus on different asset classes and aspects of the problem: Bhargava, et. al. and Goetzmann, et. al. focus on international funds while Chalmers, et. al. studies small-cap U.S. equity funds as well. Goetzmann et. al. and Greene and Hodges provide estimates of dilution, while Boudoukh, et. al. examines the extent to which arbitrage trading strategies can be hedged.

120.    In October 2002, three Yale School of Management professors, William N. Goetzmann, Zoran Ivkovic, and K. Geert Rouwenhorst, published an article entitled "Day Trading International Mutual Funds: Evidence and Policy Solutions" (the "2002 Yale Study"). The 2002 Yale Study clearly recognized the abundance of literature on this topic:

> We are not the only researchers to point out the problem posed by the use of stale prices to compute NAVs. Neumark, Tinsley, and Tosini (1991) show that the opportunity for speculative profits in international mutual funds is not as much of an informational efficiency problem as it is an institutional efficiency problem. Contemporaneous research by Chalmers, Edelen, and Kadlec (2001), Greene and Hodges (2002), and Zitzewitz (2002) investigates the potential profitability of trading on stale prices using both international and small-cap funds. Using various performance measures, all three papers show that day trading in mutual funds using current information has the potential to generate profits.

121.    The widespread press reporting, regulatory actions and academic publications educated the arbitrage community about the opportunities inherent in mutual fund pricing practices. Four Professors of Finance at the Stern School of Business, New York University, Professors Jacob Boudoukh, Matthew Richardson, Marti Subrahmanyam, and Robert F. Whitelaw, in an article in the July/August 2002 edition of <u>The Financial Analysts Journal</u> entitled "Stale Prices and Strategies for

46

Trading Mutual Funds," explained how specific market timing strategies could be refined through hedging.  Additionally, the authors noted that they "know of at least 16 hedge fund companies covering 30 specific funds whose stated strategy is 'mutual fund timing.'"

122.    The popular press also carried articles attacking market timing practices long after the initial flurry of articles attendant to the October 1997 Asian market crash.  For example, a June 2000 article in TheStreet.com, entitled "Your International Fund May Have the Arbs Welcome Sign Out," highlighted the NAV arbitrage problem and the dilution to long-term mutual fund shareholders it causes, and a July 2000 article in the same publication, entitled "International Funds Still Sitting Ducks for Arbs," presented a detailed example of an April 2000 recurrence of the October 1997 Asian market crash arbitrage opportunity, albeit on a smaller scale.

123.    These academic and press articles constituted yet other substantial red flags highlighting the pervasive and costly nature of the market timing problem across the industry.  These articles, especially in combination with the other widely reported and available regulatory, academic and general press information on the topic, at a minimum, put directors and senior management of companies with significant operations in the mutual fund management industry on notice not only that the problem existed and was pervasive, resulting in billions of dollars in dilution to long-term investors each year; but that it could be effectively addressed and resolved through reasonable compliance oversight and implementation of fair value pricing practices.

**The Mutual Fund Industry Has Been Slow To**
**React, And Has Implemented Policies  And Procedures**
**Designed To Permit Selective Arbitrage Activity**

124.    As detailed herein, the market timing/late trading problem has long been both pervasive and well recognized.  The solution to it has been clear, yet in most instances too little, too late has been undertaken by the mutual fund industry in response.  The reason why is inter-twined with the inherent conflict of interest manifest in the mutual fund industry.  As noted above, mutual funds are largely overseen and managed by investment adviser companies.  Fees and payments to the investment adviser companies are tied to assets under management (typically paid as a percentage thereof), and not to the performance of the funds.  Schemes that permit investment adviser companies to increase their fees and payments by artificially increasing the amount of assets under advisement or by increasing investments in hedge funds and other investment vehicles also managed by the same advisers, as part of a reciprocal agreement with arbitrageurs have a direct impact on the adviser firm's bottom line.  Thus, investment adviser companies have little real incentive to design and implement truly effect anti-arbitrage policies and practices.

125.    It is beyond cavil that the mutual fund industry was on clear notice of the existence and scope of the problem.  Stark evidence of the practice, and its harmful dilutive consequences, was readily available to mutual fund management based on routinely generated trading records from the funds.  Illustrative of this fact, New York Attorney General Eliot Spitzer testified before the Senate Committee that:

Here's why directors were on notice that their funds were being mismanaged:

48

Fund directors could and should have suspected that their funds were permitting market timing by simply comparing the fund's average net assets -- the amount, on average, that a fund's shareholders have invested in a fund, with the fund's total redemptions -- the amount that the fund paid out to shareholders cashing out their shares.  Since most fund shareholders are relatively long-term investors, total redemptions are on average a percentage of its net average assets.  A red flag should therefore have been raised if a fund's total redemptions are several times its average net assets.  While not the only possible explanation, it strongly suggests that the fund is permitting rapid-fire, in-and-out market timing and trading.

A red flag should also be raised when there is a very close correlation between a fund's total sales and total redemptions.  Since market timers cycle large amounts of money in and out of the funds they are timing, those funds are likely to report that total sales -- which represents money flowing into the fund, and total redemptions -- which represents money flowing out of the fund, are close to equal.  At a minimum, directors who were doing their jobs would give a fund that has an almost 1:1 ratio of sales to redemptions some added scrutiny.

126.    Transactional data similar to that highlighted by Spitzer, routinely collected by and/or for Putnam, likewise demonstrated the presence of rampant market timing at certain Putnam mutual funds as well.

## MARKET TIMING WAS PREVALENT AT MMC

127.    As described below, market timing at Putnam occurred in two distinct forms -- the first through authorized trading by certain favored 401(k) pension plans participants, and the second through the Company's permitting and/or acquiescing in, year after year, continued, substantial market timed trading in their personal accounts by Putnam in-house investment management personnel, including market timing mutual funds over which certain of these managers had direct control.

49

**Improper Market Timing Arrangements With**
**Participants in Certain 401(k) Pension Plans**

128.    Putnam had a strong motivation to actively permit market timing by participants of

certain 401(k) pension plans, namely attracting their -- and other pension plan -- business in an effort

to increase assets under management.  As Peter T. Scannell, a Putnam whistleblower, testified before

the Subcommittee of Financial Management, the Budget and International Security, U.S. Senate

Committee on Governmental Affairs on January 27, 2004 ("Scannell Testimony"):

> On another August [2002] day the Preferred Services Specialist Group in Norwood,
> Massachusetts was visited by the Managing Director of Defined Contribution Plan
> Administration.  He evidently came to see first hand what functions we were
> performing to retain assets at Putnam, a high priority given the incredible flight from
> Putnam Funds.  Asset retention was priority number one for our group and second
> to it was enrollment.  We needed every possible employee in our plans to participate
> and we started flying members of our group around the country to educate,
> encourage, and most importantly to enroll in their 401K.
>
> *   *   *
>
> Putnam was aggressively seek[ing] out union business and was quite successful
> acquiring those accounts.
>
> *   *   *
>
> A few days after that one of my team members next to me got up from his desk, after
> having executed another million dollar market timing exchange for a known market
> timer, to confront the same AVP as I did and ask him about the spreadsheet he made
> and how effective it was in helping Putnam putting a stop to market timing.  I saw
> him talking with the AVP in front of other supervisors and return to his desk quite
> upset and very frustrated.  I asked what transpired, and he told me in so many words
> that if we were to stop them from market timing that we might lose the plan and
> others, the Taft-Hartley Plans were becoming very lucrative for Putnam.

129.    The Massachusetts Office of the Secretary of the Commonwealth, Securities Division

("MOSC"), in its Offer of Settlement, made similar findings regarding Putnam's financial incentive

to continue to permit these improper trading practices:

Putnam did not restrict the market timing or short-term trading activities of the plan participants in the two Taft-Hartley Plans [described below] because Putnam was aggressively seeking to expand their DC/401K plan business and retain their current plans in a competitive market.

According to a Putnam employee, 'the Boilermakers can call in whenever they want. They trade whenever they want and they can call in at quarter to four in the afternoon, put through a trade, and keep doing it day after day to be able to capitalize on their gains in the international funds." (Citation omitted.)

Putnam further permitted the participants in the Boilermakers plan to make unlimited and frequent trades between the Voyager fund and the Stable Value fund from at least 2000 because they wanted to secure the business from the Boilermakers International plan.

In an e-mail dated March 17, 2003 from Robert Gowdy, he states, "This client (Boilermakers) was instrumental in Putnam securing the $100MM INE mandate from the Boilermakers International last year." (Citation omitted.)

130.    This attitude of placing corporate ethics and fiduciary duty hostage to the operational impetus to build business regardless of the risks or potential adverse consequences was fully evident in facts uncovered by regulators regarding at least two 401(k) pension plans, where hundreds of millions of dollars of improper market timing transactions were made by or on behalf of certain privileged pension plan participants over a multi-year period.

### a.    <u>Boilermakers Local Lodge No. 5</u>

131.    The DC/401(k) pension plan for the Boilermakers Local Lodge No. 5 ("Boilermakers") had been investing through Putnam since 1991.  In its Offer of Settlement, the MOSC found that in response to internal concerns, Putnam reviewed trading activity of the Voyager Fund as early as March 2000, at which time the Boilermakers Plan was identified as one of the market timing accounts.  This fact was the subject of several internal e-mails within Putnam.

Despite knowledge of the existence of this practice, Boilermakers nonetheless were allowed not only to continue this blatantly improper trading, but also to substantially expand it in scope.

132.    Boilermakers' substantial market timed trading continued with ever- increasing frequency from at least January 2000 until September 2003, when Putnam was finally forced to halt it, based solely on receipt by the Company of the subpoena from the MOSC.  These market timing practices were both widely known and condoned by senior management within Putnam.

133.    The MOSC found that Putnam Dedicated Services Representatives ("DSRs") knew of the activity since at least 2001, and that, in fact, based on the number of telephone calls received from Boilermakers, the hour between 3 and 4 p.m. became known internally as "Boilermaker Hour." Certain Dedicated Services Representatives repeatedly brought this improper trading activity to the attention of Putnam, only to be told that any corrective action was the responsibility of Putnam, and thus, that these concerned DSRs should 'not concern themselves' with the market timing activities of the Boilermakers.  In the Spring of 2002, Putnam directed other Services Representatives to track the activity of the Boilermakers, but those representatives never received any feedback from management regarding the results of their monitoring, and the market timing activity continued unabated.

134.    The MOSC further specifically found that, since at least December 2002, Putnam knew that the market timing activity in Boilermakers had become significant.  For example, an e-mail regarding the market timing activity starkly discloses: "The population is now 28 people out of a total plan of 944.  This represents 2.9% of the total participants with a balance but represents

20% of the assets.  Now this population represents 99% of the exchanges in International Voyager,

99% of the International Growth Exchanges, and 98% of the money market exchanges."

135.   The MOSC noted:

As evidenced by the additional e-mails, the volume of exchanges and amount of
funds were material and would have certainly triggered one or more of the daily
reports reviewed by the Putnam MTD.  Even though Putnam had identified specific
plan participants who were market timing, they failed to take any meaningful steps
to restrict and/or eliminate this short-term trading activity in the Boilermakers plan
until 2003.

136.   The Boilermakers market timing scheme was huge and obvious.  At least twenty-eight

Boilermakers Plan participants made anywhere from 150-500 market timed trades over a three year

period, resulting in these plan participants skimming millions of dollars in profits from the plan into

their personal accounts.   At least one individual, alone, generated a million dollars in improper

profits in his retirement account over a three year period through market timing the Putnam Interna-

tional Voyager fund ("Voyager fund").  During that same period, the total trading volume in and out

of the Voyager fund amounted to approximately *half a billion dollars*, with each individual

participant profiting by between $100,000 and over $1 million as the result of such improper trading.

137.   A compelling chronology of this scheme by Boilermakers was in the Scannell

Testimony:

The Preferred Specialist Group, of which I had become a member after successfully
completing my exams, became aware of this market timing strategy [by the
Boilermakers].  *We knew of all sorts of individual market timers in many of the over
2000 plans we managed but this group was on to something quite different and for
their self-interest, quite effective*. ...   We were constantly complaining to our
supervisors and they were beginning to feel the heat.  The Boilermakers were making
a killing.  As an example, there was one member whose balance in July of 2000 was
$525,800.55 and in sixteen months after 542 exchanges it grew to $1,472,214.01.
The Preferred Specialist Group was becoming a very savvy group.  We researched

and tracked the market timing activity and shared this information at lunch.  Through my research I learned market timers were in fact pillaging the profits of the long term shareholder.  *Unfortunately managers gave us the same lame excuse we had heard before, Putnam does not have a system in place to discover market timers it's a manual process.*

Emphasis added.

138.    As Mr. Scannell testified, the volume and dollar value of the market timing activities

of certain members of the Boilermakers was extraordinary:

In August of 2002, I and those who also were concerned about the Boilermakers market timing could not believe the numbers that were being generated by this group of ten members in the 1,000 member union plan.  They had exchanged more than HALF A BILLION DOLLARS with gains of close to TWO MILLION DOLLARS. The International Voyager Fund was having a portion of its gains, which should be shared amongst the entire shareholders of the fund, being extracted for a few.  What did these guys have going on with Putnam that would allow them to continue rolling this snowball, and it was just starting to pick up some real steam.

Emphasis in original.

139.    Mr. Scannell's testimony likewise included many instances when senior management

at Putnam was repeatedly made aware of both the existence and the scope of the problem at the

Company.  For example, he testified about a meeting in late September 2002, with the SVP and

Director of the call center, another SVP, a human resource representative and the Preferred Specialist

Group.  At the end of the meeting:

One of the Preferred Specialists attending took the Senior VP up on his offer to voice any concerns we may have.  She inquired about market timing and the Boilermakers getting rich doing nothing but market timing International Voyager.  Another representative asked before the SVP/Director had a chance to respond, why did we not put the same restrictions on Boilermakers as Flour Hanford Plan asked Putnam to implement.  The Plan wanted to put exchange restrictions of no less than 15 day in and out of any particular fund; they had caught wind of their employee's market timing.  Evidently management at Flour Hanford felt it was a great distraction at the

work place.  The SVP/director became quite uncomfortable and said, "Listen, it isn't CRIMINAL," and quickly tried to change the subject without addressing the suggestion.  When the SVP/Dir. said it isn't CRIMINAL, it was my turn to become very flushed. I turned and looked at my other SVP to see what his reaction would be and he was staring directly at me - he was obviously not pleased with the remark.

**b.**     **Joint International Board of Electrical Workers**

140.     The MOSC also found that at least by early 2000, DSRS at the Norwood, Massachusetts office were aware of excessive market timing and short-term trading activity from the Joint International Board of Electrical Workers ("JIBEW") plan participants.  Based on readily available NASDAQ trading data, it was apparent that the participants were making frequent in-and-out trades between the Putnam New Opportunity fund or Putnam OTC Emerging Growth fund into the Putnam Stable Value fund.

141.     Unfortunately for the JIBEW plan participants, their marketing timing strategy stopped being profitable for them in 2001, when the NASDAQ declined significantly.  The MOSC found that, ironically, these improper trading practices with the JIBEW plan participants ultimately ceased not as the result of any oversight, controls or remedial action implemented, undertaken or enforced by Putnam, but rather because: "Eventually, most of the JIBEW plan participants lost so much money that they stopped market timing the funds." In fact, the MOSC found that "Despite also having knowledge of the JIBEW market timing activity, at no time did Putnam inform the plan or restrict the excessive short-term trading activity of the JIBEW plan participants."

142.     Mr. Scannell testified as well regarding the perpetration of this JIBEW market timed trading scheme at Putnam again undertaken and executed with senior management's full knowledge and acquiescence:

My first exposure to market timing at Putnam Investments occurred almost immediately after having completed three week [sic] of intensive training for my position as a call center representative.  My initial responsibilities included exchanging funds for participants in our defined contribution plans, as well as Taft-Hartley plans (union retirement plans).  The Joint Industry Board of Electricians was the first plan that I was exposed to who had members actively market timing two Putnam funds that mirrored the NASDAQ.  Every day in the spring and summer of 2000 that saw movement in the NASDAQ, whether it be up or down, we would receive scores of request from the JIB members to move their entire balances in or out of either Putnam New Opportunity Fund (PNOPX) or OTC and Emerging Growth Fund.

. . .  Many members just did not understand that they were losing huge amounts of their hard earned retirement balances.  I and other call center representative would constantly inform our supervisors and [sic] of this activity, concerned over the devastating losses the members practicing these prohibited transactions were incurring, we felt that Putnam had a fiduciary responsibility to stop them from further damaging themselves, unaware at that time that the unwitting long term shareholder was being hurt as well.

The call center representatives cared very much about the financial well being of the JIB members, as well as all of our clients.  As the Markets were plunging in 2000, Putnam wanted us to convey to our clients the importance of diversification and the suitability of their investment choices given their years to retirement.  But never were we told we could discourage our clients from market timing.  Nobody was sure what to do and it became obvious that discussions about market timing were met with deaf ears.  We continually tried to do the right thing and were disturbed that every time we would bring up market timing and the damaged it caused to our supervisors we were told that there is not a system in place to detect that activity.  Putnam employees that I came in contact with on a daily basis and who because of their positions were exposed to market timing bought that excuse for awhile, it eased our pain.

143.    The purpose of Putnam's anti-market timing policy – as expressed in the plan prospectuses – was to protect long-term investors from the recognized negative effects of excessive "in-and-out" trading activities, including but not limited to dilution of share value, negative tax consequences, increased transaction costs, and loss of fund investment opportunities.  In the face of the representations made in its prospectuses, and unbeknownst to long-term shareholders, Putnam

for years instead allowed certain mutual fund shareholders, such as the Boilermakers and the JIBEW, to engage in pervasive market timing activities, in direct contradiction to the prospectus disclosure.

144.    As further reflected in the prospectuses, Putnam fund management always had the authority to reject market timing trades.  Putnam, however, routinely permitted participants in certain preferred 401(k) pension plans to enter into market timed transactions at will.  By permitting market timing activity by these plan participants, Putnam effectively allowed these customers to improperly capture a portion of the fund's overall gains, to the direct and indirect detriment of from the long-term shareholders within the fund (and, at times, even the market timers themselves).

**Regulators Eventually Exposed These Market Timing**
**Arrangements At Putnam and Putnam's Long**
**Standing Knowledge of Market Timing Arrangements**

145.    As noted above, in September 2003, New York State Attorney General Eliot Spitzer disclosed an investigation into widespread improper trading schemes involving Canary, and a continually expanding array of well-known mutual fund companies.  Press reports made clear that Spitzer's office, and other state and federal regulatory agencies, were continuing to expand their investigations into these wrongful practices.

146.    Around this same time period, Mr. Scannell, a Putnam registered agent, approached the MOSC alleging that certain DC/401(k) plan participants were permitted to execute excessive market timed trading in various Putnam mutual funds over a multi-year period, that Putnam was well-aware of this pervasive misconduct, and that it nonetheless failed to take any steps to stop it.

147.    Based on this initial information, and on additional evidence obtained by the MOSC regarding Putnam's mutual fund practices, on September 11, 2003, the MOSC served Putnam with a subpoena duces tecum for records, and authorized a formal investigation into the Company's

activities to determine whether certain business practices had violated provisions of the Massachusetts Uniform Securities Act.

148.    On October 28, 2003, the MOSC alleged in an Administrative Complaint:

Since Putnam management carved out an exception for DC/401(k) plans and chose not to impose a monetary deterrent to discourage market timing activity in such plans, Putnam has a heightened burden to monitor and stop this activity in DC/401(k) plans so as not to render meaningless the prospectus disclosures.

The language of the prospectus indicates that Putnam will actively monitor that excessive market timing and short-term trading because of the recognized harm that this type of trading activity has on the performance of the fund.  Furthermore, the prospectus language indicates that any market timing activity or short-term trading will be stopped.

Putnam's prospectuses do not indicate that certain mutual fund customers would be allowed to engage in market timing activity or short-term trading.

However, certain Putnam customers were allowed to do just that.

149.    Moreover, the MOSC found:

Putnam has also recognized the additional costs that market timing and short-term trading activity places on mutual funds.  In fact, Putnam outlined some of the same costs of market timing and short-term trading on long-term investors in its Market Timing Department Functional Narrative March 2003:

     a.     Increases transaction costs associated with high levels of trading.

     b.     May generate unwanted taxable capital gains distributions if fund managers are forced to liquidate holdings to meet redemption needs.

     c.     May force fund managers to maintain higher cash positions.

     d.     May disrupt stated portfolio management strategies.

     e.     May take profits at the expense of long-term investors.

150.    In response to increasing damage to the performance and value of its mutual funds by speculators, market timers, and arbitrageurs, in 1996, Putnam formed a Market Timing

Department ("MTD").  According to the MOSC, the purpose of the MTD was to "review available data to determine if specific trading patterns fall within the parameters of the definition of 'abusive or excessive'" and to communicate with the offenders "with regard to market timing issues."

151.    The MOSC Administrative Complaint specifically alleged:

Putnam's policy as it said in numerous e-mails and internal memoranda was that it did not tolerate market timing and short-term trading in its mutual funds.  According to their records, the MTD attempts to stop most shareholders and brokers from market timing or making short-term trades.  (Citations omitted.)

Yet from its inception, the MTD had specific policies and procedures that intentionally excluded taking action in certain areas, including the DC/401K plans.

152.    The MOSC found that Putnam's internal guidelines set forth the following list of activity reports that were to be investigated by the MTD:

    a.    100K Report (any single exchange over $100,000);

    b.    Purchases over $250,000;

    c.    Redemptions over $250,000;

    d.    Four exchanges of $75,000 or more within a single account in a 6 month period;

    e.    Any exchange involving 1% of the assets of the fund moved in and out within 10 days;

    f.    Assessment of Short-Term Trading Fees;

    g.    Share Proof Report;

    h.    Putnam/Fund Report; and

    i.    Distributor-by-Fund Report.

153.    Highly relevant to the largely unregulated status Putnam granted to DC/401(k) pension plan participants regarding market timing, the MOSC found that Putnam did not even authorize the MTD to see participant trading histories in DC/401(k) plans until March 2003.

154.     The MOSC found that while the purpose of the MTD was to monitor and enforce policies against market timing and short-term trading set forth in the prospectus, in actuality, the MTD failed to give meaning to the prospectus disclosure because the policy was not uniformly applied, as management, in effect, had the ability and authority to override the policy in its discretion to permit certain customers to market time and make short-term trades without censure or limitation.

155.     As noted above, the function of the MTD was specifically designed and implemented to ensure that market timing monitoring and controls did *not* apply to trading in DC/401(k) plans. In fact, prior to March 2003, only the plan Relationship Manager and other DC plan servicing employees were able to review participant transaction history and information.  The MTD would only become aware of marketing timing activity within the DC plan if the plan's overall activity triggered one of the general mutual fund flow reports.

156.     The MOSC found that: (i) it was Putnam's practice with regard to any market timing activity triggered by the DC plans to send the information to Putnam Retail Management ("PRM") and to the Relationship Manager for the plan, and (ii) the MTD's practice did not even include procedures for following up on any referrals made from the MTD regarding the DC plans.  Such procedures were not formalized at Putnam until the MTD internally published the Market Timing Department Functional Narrative March 2003, that stated:

> [t]he role of this department with respect to potential market timing within 401K Plans is basically one of advice.  If, based upon a review of the Plan accounts. . .there appears to be market timing within a plan, we advise Putnam Retail management of the issue and provide a brief summary of the suspect activity.

157.     The MOSC also found that Putnam's policies further provided that if the PRM "agrees that market timing within the Plan appears to be taking place, the DC Contact (depending

upon Plan Type) is contacted via e-mail by this department (with PRM copied), provided with the details of the suspect activity, and asked to identify, and follow-up as necessary, those participants that are market timing."   Finally, the MTD guidelines stated emphatically, "[c]ommunications regarding any of these issues with the Plan Sponsor are handled by DC and NOT by this department" (emphasis included in the original).  Although the MTD can now monitor activity at the participant level for the DC plans, the process remains the same - the participant activity is referred to the PRM and the plan RM for follow-up.

158.    The MOSC highlighted the self-evident conflict of interest inherent in, and strong financial motivation behind this approach, finding that:

> However, PRM's have no incentive to report or take action against market timing participants.  Their focus is on maintaining good terms with the plan administrators and retaining the million of dollars of plan assets at Putnam.

> Ultimately, the MTD procedures allowed the department to pass on any trading or timing concerns regarding plan participants to the PRM without follow up or corrective action and thus enabled these plan participants to engage in market timing and short-term trading for years.

159.    Also on October 28, 2003, the SEC instituted administrative proceedings against Putnam Investment Management in connection with self dealing in Putnam Mutual Funds by fund managers.  As the SEC found, beginning in at least 1998, at least six Putnam employees working as investment management professionals engaged in short-term trading of Putnam mutual funds through their personal accounts:

> Four of those employees engaged in such trading in funds over which they had investment decision-making responsibility and had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

\*   \*   \*

By at least early 2000, Putnam became aware that several investment management employees were engaging in potentially self-dealing short-term trading of mutual fund shares in their personal accounts.  However, Putnam failed to disclose this potentially self-dealing securities trading to the boards of the mutual funds it managed and to the funds' shareholders.  Moreover, Putnam also failed to take adequate steps to detect and deter such trading activity through its own internal controls and its supervision of investment management professionals.  By virtue of this conduct, Putnam violated its fiduciary duties to Putnam's family of mutual funds in violation of, among other things, the antifraud provisions of the Advisers Act.

160.    Since 1998, Putnam knew that senior fund executives, had been market timing Putnam funds for which they acted as fund managers, including Putnam's Voyager fund, Europe Growth fund, International Growth fund, and Global Equity fund.  Despite knowledge of this activity, for more than two years, Putnam continued to turn a blind eye to it, and failed to take any remedial action.

### a.    <u>Omid Kamshad</u>

161.    Kamshad was Chief Investment Officer for International Equity at Putnam since early 2002 and a portfolio manager for at least seven mutual funds whose portfolios contained international securities.  As the SEC found, by virtue of his position at Putnam, Kamshad had access to non-public information  not readily available to fund shareholders regarding, among other things, current portfolio holdings, valuations and transactions.

162.    Kamshad's self-dealing trading was extensive and obvious.  Between 1998 and 2003, Kamshad engaged in at least 38 "round trip" trades of Putnam funds, including at at least four funds he participated in managing.  In these "round trip" trades, Kamshad sold fund shares an average of only 13 trading days after having purchased them, and often sold such shares only three or fewer trading days after their purchase.  These trades typically entailed transactions of *hundreds of*

*thousands of dollars* worth of fund shares.   On at least one occasion, the value of his short-term trade *exceeded $1 million*.   As a result of such massive short-term trading, Kamshad realized hundreds of thousands of dollars in improper and/or illegal gains.

163.    Furthermore, Kamshad's self-dealing trades were well-known at Putnam and no steps were taken to discipline Kamshad and other known internal market timers, nor to ensure that this misconduct did not continue.  In January 2000, senior managers in Putnam's retirement plan group learned of "large and frequent movement" of Putnam funds by Kamshad.  On January 25, 2000, the director of Putnam's employee relations and staffing unit confronted Kamshad regarding his improper trading history, and obtained Kamshad's purported commitment to cease that type and level of activity.  On February 18, 2000, the director issued a memorandum to the file confirming this conversation and Kamshad's commitment. Nonetheless, Kamshad continued to engage in short-term trading in Putnam funds, making least nine (9) additional round trip trades between February and April 2000.

164.    At a mid-2000 meeting with investment professionals, a Putnam senior executive stated that Putnam employees must not engage in short-term trading in Putnam funds, and told attendees that their trading must be beyond reproach.   Kamshad, like other Putnam portfolio managers, attended this meeting.  Despite the admonitions at that meeting, Kamshad nonetheless continued to engage in short-term trading.  Specifically, between August 2000 and September 2000, he made seven more round trip trades.  In fact, as recently as March 2003, Kamshad purchased more than $850,000 worth of shares in Europe Equity, a fund on which he was the Lead Manager.  Four trading days later, he sold shares in this fund, garnering an improper profit in breach of his fiduciary duty of more than $79,000.  The SEC found that, not surprisingly in light of the Company's facially

inadequate actions, in total, Kamshad engaged in at least 20 *additional* short-term round trip trades *after* he had been warned about his conduct.

**b.**     **Justin M. Scott**

165.     Scott was Chief Investment Officer of the International Equities Group at Putnam and Portfolio Manager for at least five mutual funds whose portfolios contained international securities. By virtue of his position at Putnam, Scott also had access to non-public information not readily available to other fund shareholders regarding, among other things, current portfolio holdings, valuations and transactions.

166.     The SEC specifically found that between 1998 and 2000, Scott engaged in approximately 35 round trip trades in Putnam funds, including funds he participated in managing. In 2000 alone, Scott engaged in at least 12 trades in which he bought and then sold mutual fund shares on consecutive days, often entailing trades of *millions of dollars* worth of mutual fund shares and realizing hundreds of thousands of dollars.

167.     On February 18, 2000, Scott, a superior to Kamshad, was copied on a memorandum regarding Kamshad's short-term trading activities. The memorandum, which addressed the warning given to Kamshad in January 2000, made clear that short-term trading was "inconsistent with our tolerances for standard mutual fund clients." Indeed, as of March 2000, Putnam's Intranet advised employees, among other things, that "[e]xcessive exchanges by a relatively small number of individuals among a number of Putnam's funds have had a detrimental effect on the long-term shareholders of those funds." Nonetheless, Scott, secure in the knowledge that the Company had consistently failed to take any serious or reasonable steps in response to market timing by its own

employees, continued to engage in short term trading.  The SEC found that between March and May of 2000, Scott made, acting with impunity, successfully executed more than twenty (20) *additional* round trip trades in Putnam funds, including ten (10) 'next day' round trip trades.

### c.  Other Employee Trading

168.     The SEC further found that other un-named Putnam employees likewise engaged in improper market timing and other short-term trading of Putnam funds in their personal accounts. For example:

(a)      between 2000 and 2001, a Putnam analyst and member of portfolio management teams of international funds made approximately forty-nine (49) round trip trades in Putnam mutual funds, including funds over which he had some management control and responsibility;

(b)      during the period 2000 to 2002, an international fund portfolio manager made approximately forty-five (45) round trip trades in Putnam mutual funds, including in at least one fund in which she participated in managing;

(c)      during the period 2000 to 2003, a co-manager of certain Putnam funds made approximately thirty-six (36) round trip trades in Putnam mutual funds (although none appear to have been in funds he managed); and

(d)      in 2000, an equities analyst made approximately forty-eight (48) round trip trades in Putnam mutual funds.

**Putnam's Internal Controls Were Defective**

169.     The SEC Complaint alleged that: (i) Putnam failed to supervise Scott, Kamshad, and other employees; (ii) it failed to have policies and procedures reasonably designed to prevent the misuse of non-public information; and (iii) it failed adequately to enforce its Code of Ethics.

170.     The SEC specifically found that any nominal efforts Putnam engaged in to detect and/or deter short-term trading in its complex of mutual funds were patently ineffective at preventing its own employees from engaging in short-term trading in Putnam funds year after year.  The SEC found that until 2000 there were at best minimal controls against short-term trading by Putnam's own employees in their Putnam retirement or compensation plans.  Even though Kamshad's trading came to the attention of the market timing police in 2000, who then relayed it to the Putnam group that oversees Putnam's own retirement and compensation plans, no disciplinary action was taken against Kamshad or any other employee for engaging in market timing or other short-term trading until October 2003.

171.     In 2001, Putnam implemented a control purportedly designed to detect and curb fund timing by all Putnam employees.  Beginning in 2001, Putnam conducted an annual review of employee trading frequency.  However, the SEC found that even implementing this new control, Putnam's system for detecting and preventing market timing by its own employees was "fundamentally flawed because it only monitored for market timing during one quarter of a given year, leaving more than nine months of every calendar year without any monitoring whatsoever."  Thus, the SEC found:

        •       the review could not capture market timing by an employee unless the trading occurred during the one quarter that was selected;

•       trading would be examined only if Putnam detected at least eight trades in the quarter;

•       no special scrutiny was given to portfolio managers or other investment professionals; and

•       if market timing was detected, the employee was issued written warnings stating that the employee risked losing their exchange privileges in the future if the trading activity did not stop; however, even for employees who did receive such warning letters, Putnam still failed to review trading activity for such suspect employees again for an entire year.

172.   As recognized by John Hill, independent board chairman for more than 100 Putnam mutual funds, in The Wall Street Journal article, dated January 13, 2004 "if you were a retail or 401(k) investor, any market timing was dealt with through the compliance staff in the general counsel's office. But if you were an employee, your compliance monitoring was done by the [human resources] department." (Bracketed language as in article.) Two other problems Hill highlighted were:

> Third was the fact that the compliance [department] and the general counsel were several layers down in the organization. Compliance didn't get the status and perception of importance it should have.

> Fourth, it's clear to me that there wasn't adequate compliance or code-of-ethics training at Putnam. New employees were given the book and told to read it, but there were no classes or follow up, so that was really lacking.

173.   Hill's admission regarding the utter lack of any adequate compliance or code-of-ethics training at Putnam is supported by the SEC's findings. Not until April 2002 -- at least two years *after* the Company first admitted that it learned of market timing by investment professionals in funds they helped manage -- did Putnam even bother to formally amend its Code of Ethics to include a prohibition on employee market timing of Putnam funds. The SEC found that at no time prior to

the intense scrutiny outside regulators brought to bear in October 2003, even after amending its Code

of Ethics, did Putnam disclose the employee market timing to fund boards or to fund shareholders.

174.   The Wall Street Journal subsequently reported on April 9, 2004 that:

Putnam Investments agreed to pay $110 million in penalties to state and federal regulators, settling civil charges that it allowed portfolio managers and others to profit from rapid trading of its mutual funds at the expense of other investors.  In October, Putnam, the nation's sixth-largest mutual-fund firm, was the first fund company charged in a series of share-trading scandals.  Those scandals have now led to investigations of dozens of firms, the resignations or dismissals of top industry executives and $1.8 billion in penalties.

Under yesterday's agreements, Putnam, a unit of Marsh & McLennan Cos., will pay $50 million in fines to the Securities and Exchange Commission and a like amount to the Massachusetts Securities Division, both of which had filed fraud complaints in administrative proceedings against the company.  In addition, Putnam agreed to pay $5 million to each regulator for restitution to shareholders.

*   *   *

Putnam, which now manages $227 billion, has already been punished more severely than any of its rivals, with angry investors yanking $54 billion from the firm's funds in the fourth quarter.  To reassure customers, the company has changed senior management, fired 15 employees for improper trading, cut management fees and instituted an array of controls and short-term trading fees.

SEC and Massachusetts officials said the Putnam penalty was severe, given that shareholder losses were estimated at $10 million or less.  ...  David Bergers, Associate District Administrator for the SEC's Boston office, said the level of the Putnam penalty "sends a very strong message about the egregiousness of the conduct. "Massachusetts officials also said the $55 million penalty was the largest ever assessed by the state's securities division, overseen by Massachusetts Secretary of the Commonwealth William Galvin.  Regulators said Putnam remains under investigation for other alleged mutual fund-related abuses, and two former portfolio managers still face charges.

*   *   *

Putnam settled shortly before the SEC was to hold a public hearing on April 19 that would have resembled a trial, in which SEC staff lawyers would have been sure to subject the company to a barrage of evidence and further bad publicity. In a harshly

68

worded trial brief recently made public, SEC enforcement attorneys had accused Putnam of "massive breaches of fiduciary duty" because top executives had known about fund manager trading in 2000 but failed to disclose it.

## BREACHES OF FIDUCIARY DUTY
## BY THE DIRECTOR DEFENDANTS

175.    The Director Defendants, during their tenure as directors, owed to MMC and its shareholders fiduciary duties of good faith, loyalty, and care.  In particular, their duty of good faith required each of them to bring to bear his or her experience, skill and knowledge, in the conscientious exercise of their responsibility to direct and oversee the business and affairs of MMC, in pursuit of the best interests of MMC, for the benefit of MMC and its shareholders.

176.    During the period from at least 2000 to September 2003, as alleged above, MMC permitted, acquiesced in and/or consciously disregarded (i) Putnam's DC/401(k) pension plan business being exempted from any formal control regarding the oversight or monitoring for market timing, and (ii) pervasive market timed trading by mutual fund management personnel -- some in funds over which they exercised management control.

177.    MCC's Proxy Statement states that the Audit Committee has specific oversight responsibility with respect to the Company's system of internal controls, as well as the internal and external audit process.  Reflecting these same points, the Company's Audit Committee Charter, under the heading "Responsibility," provides:

> The Committee is a part of the Board.  It's primary function is to assist the Board in fulfilling its oversight responsibilities with respect to . . . (ii) the system of internal controls that management has established; and (iii) the internal and external audit process.

178.    Under the heading "Specific Duties," The Charter includes:

69

Review with management, internal audit and the independent accountants the methods used to establish and monitor the Company's policies with respect to unethical or illegal activities by Company employees that may have a material impact on the financial statements.

179.    Finally, the Charter delineates the specific duties and responsibilities of the Audit Committee members to include the oversight of compliance and regulatory matters, encompassing, inter alia, direct responsibility over MMC's Code of Business Conduct and Ethics, which the Committee is tasked to review "periodically (including compliance therewith) and report on such compliance to the Board."

180.    With respect to the Directors and Governance Committee, MMC's March 2003 Proxy made clear the committee members was specifically tasked with, inter alia, with responsibility to develop, review and periodically reassess MMC corporate governance principles, and recommend proposed changes to the board.

181.    Thus, each of the Director Defendants were fully aware of the Board's duty and responsibility of oversight with respect to compliance with applicable laws and regulations, and, in addition, the Director Defendants who served on the Audit and the Directors and Governance Committees further undertook special responsibility to act as the stewards of this critical board function.

182.    Likewise, the Board, and the members of the Audit and the Directors and Governance Committees in particular, were also aware of, and were required (as a matter of complying with their fiduciary duty of good faith) to act with care and diligence in their oversight of the Company's internal controls with respect to compliance. Accordingly, under the standards set forth in the COSO framework, their ongoing oversight of the adequacy and effectiveness of these controls required them

to satisfy themselves that each of the five components of internal control -- Control Environment, Risk Assessment, Policies and Procedures, Information and Communication, and Monitoring – were present and operating effectively.  Moreover, their duty of good faith also required them to take into account the compliance system criteria set forth in the Federal Sentencing Guidelines.

183.    At all relevant times, the Director Defendants were fully aware of the highly regulated nature of MMC's constituent businesses, including its asset management business, and the special risks posed to MMC and its shareholders by the highly regulated business environment in which it operated.

184.    At all relevant times, the Director Defendants were fully aware that, MMC and its operating subsidiaries stood in a special relationship of trust and confidence with respect to the funds and the investors in them as investment adviser to mutual funds with hundreds of billions of dollars of assets under management, having undertaken to provide not only investment management services to these funds, but also to provide virtually all administrative, custodial and compliance services for the funds.  These special duties carried with them legal and reputational risks that, in light of their fiduciary nature, the pervasive regulatory structure imposed, and the staggering sums of money entrusted to MMC, represented a potential for massive harm to MMC in the event of a compliance failure.

185.    Beginning not later than 1997, and most probably much earlier, the Director Defendants, in their business and/or directorial capacities, were aware that mutual funds, by their nature, could be used as a vehicle for arbitrage by sophisticated short-term traders, and that such arbitrage harms long-term fund investors through dilution and the imposition of increased costs that

have no benefit to the funds investors. The extensive regulatory, industry and press articles concerning this risk to fund investors are detailed herein.

186.   In addition to being aware of the substantial risks posed to fund investors by the phenomenon of market timing arbitrage, the Director Defendants were also aware at all relevant times of the conflict of interest inherent in the very structure of the mutual fund industry, exacerbated by the traditional mode of compensation of investment advisers to mutual funds -- fees based on a percentage of assets under management -- which creates an ever-present risk that investment adviser management and personnel may be influenced by incentives to increase assets under management through methods that disregard the welfare of, and may in fact operate to the detriment of, mutual fund investors.

187.   The Director Defendants were all clearly on notice that Putnam mutual funds had suffered devastating losses over the period 2000 through 2002, with revenues falling by over $1 billion (or more than 33%), and net income falling by $467 million (or almost 33%). These declines not only directly affected Putnam's bottom line, but also MMC's as well.

188.   The Director Defendants were likewise also clearly on notice that Putnam's major mutual funds had suffered a massive exodus of assets under management over the same period, dropping by almost $120 billion, or almost 33%. These adverse market developments, together with the Company's fee-based compensation practices -- established based on a percentage of assets under management -- placed Putnam executives under tremendous pressure over this same period to increase and/or retain assets under management in any manner possible, including improper and/or illegal arrangements such as market timing.

72

189.   Each of these risks had a high likelihood of occurrence -- in fact, they were all occurring and were readily apparent to all persons involved in or reporting on the mutual fund management industry, and thus were known or recklessly disregarded by the Director Defendants. Viewed together, these significant risks created a potential for harm to MMC of a substantial magnitude.   This fact, too, was readily apparent to all persons involved in the mutual fund management industry, and thus was either known to the Director Defendants or recklessly disregarded by them.

190.   As detailed herein, in the face of these known risks, the Director Defendants abdicated their oversight responsibilities, in breach of their fiduciary duty of good faith in that they failed to take the most fundamental action in the face of these known risks, namely, to issue a direct and unambiguous company-wide directive proscribing market timing in any form or manner. Instead, the Director Defendants either intentionally or with conscious disregard, acquiesced in the publication of prospectus disclosures that (as found by the MOSC):

> indicate [ ] that Putnam will actively monitor that excessive market timing and short-term trading because of the recognized harm that this type of trading activity has on the performance of the fund.  Furthermore, the prospectus language indicates that any market timing activity or short-term trading will be stopped."

Contrary to such representations, however, the defective and inadequate system of oversight and control in place at MMC and Putnam improperly vested full discretion to operational management, particularly in the area of DC/401(k) pension plans, to permit market timing.  This fact predictably resulted in substantial market timing activity in certain 'preferred' DC/401(k) pension plans, occurring with management's full knowledge and concurrence.

191.    The Director Defendants further breached their fiduciary duty by recklessly failing to implement an effective and adequate system of controls and reporting to require, at a minimum, the comprehensive prohibition of market timed trading for their own accounts by Putnam senior management personnel -- particularly in mutual funds they controlled.  Even after such misconduct had been repeatedly identified internally, the conduct was never effectively halted, the personnel were never disciplined and the improper profits earned were never reclaimed.

192.    This fact is made even more material in light of the fact (as revealed by Mr. John Hill, the independent board chairman for more than 100 mutual funds operated by Putnam, in a January 2003 The Wall Street Journal article) that "any market timing was dealt with through the compliance staff in the general counsel's office" and that -- reflecting the Company overall lax attitude regarding compliance, "the compliance [department] and the general counsel were several layers down in the organization.  Compliance didn't get the status and perception of importance it should have." (Bracketed language in article).

193.    Further relevant to the Company's overall deficient approach to compliance, Mr. Hill went on to reveal:

> "it's clear to me that there wasn't adequate compliance or code-of-ethic training at Putnam [a direct responsibility of the Audit Committee, see ¶178 above].  New employees were given the book and told to read it, but there were no classes or follow up, so that was really lacking."

194.    Based on the foregoing, the Director Defendants breached their duties of good faith in multiple ways.  First, the Director Defendants were acting in direct disregard of the Company's fiduciary duties to the Putnam funds and the investors therein.  As noted above, the Director Defendants knew that market timing harms long-term fund investors by allowing market timing

74

arbitrageurs to skim their profits, as well as by imposing additional costs on the funds, yet they took no effective or reasonable steps to circumscribe the conduct at MMC.  The egregious nature of this misconduct is exacerbated when the market timing at issue is done by portfolio managers and other Putnam personnel for their personal benefit, facilitated by their access to non-public information about the funds.

195.    Failure to take direct action prohibiting such activity across the board cannot be reconciled with any good faith attempt to oversee MMC and Putnam's compliance in a manner consistent with its fundamental fiduciary duties to its clients.  In disregarding this clear compliance risk, the Director Defendants also ignored the corresponding risk of massive financial and reputational harm -- in terms of liability to fund investors, adverse regulatory action, and damage to the reputation and goodwill upon which the Company's business depends -- to  MMC and its shareholders.  Stark evidence of the reality of this harm is found in the fact that, over the three months following public disclosures of this misconduct by regulators, Putnam mutual funds were pummeled, with irrate investors withdrawing *more than $54 billion* as of December 31, 2003.

196.    Reflecting this grim fact, Mr. Don Phillips, <u>Morningstar</u>'s Managing Director, found:

'There are two penalties a firm pays -- the fine [to regulators] and then the price in the court of public opinion,' Phillips said.  'Putnam has paid by far the biggest price in the court of public opinion.'

197.    In addition to failing to issue an unambiguous company-wide proscription against market timing activities, the Director Defendants also breached their fiduciary duty by failing to implement any of the simple, straight-forward and highly effective measures to foreclose market timing that were readily available, yet were never implemented.  For example, the MMC board could have, but recklessly failed to ensure that Putnam implemented policies to preclude profiteering from

such arbitrage activities.  In a classic case of 'closing the barn door after the horse,' Mr. Hill was

further quoted as describing one obvious example:

> We've also added 2% short-term transaction fees on trades within five days buying
> fund shares.  We had 1% fees on trades within 90 days of purchase.  *We thing if you*
> *take away the ability to profit from timing, the problem will go away.  We want*
> *timers to know Putnam is not a good place to go.*

Emphasis added.

198.    Far from implementing such simple measures to eliminate the ability to profit from

market timing, as detailed herein, the Company:

- •    specifically acted *to exempt* 401(k) pension plans from the redemption fees
  imposed for rapid turn-around transactions;

- •    permitted the establishment of a facially defective and inadequate oversight
  and monitoring system at Putnam under which pension plans were
  specifically *exempt from* compliance oversight by the Market Timing
  Division ("MTD"); and

- •    then failed to establish any effective alternate oversight system to track
  market timing in these pension plans.

199.    Establishing (or permitting the establishment of) such a facially defective compliance

system -- which left total discretion to the operational arm of the Company and removed by express

policy any oversight by the Market Timing Division over an entire line of business -- had the

predictable result of creating an environment in which blatant market timing abuses among

DC/401(k) pension plan participants occurred.

200.    As described with particularity herein, Putnam management viewed Taft Hartley

pension plans as an important and lucrative business line, and aggressively pursued both the

enrollment and retention of such plans.  As was thus apparent, the direct and inherent bias and

financial conflict of interest these management personnel faced with respect to market timing

arrangements in DC/401(k) pension plans -- particularly as Putnam struggled to increase falling assets under management in the midst of a market decline that had decimated its fee income -- made vesting them with such discretion reckless.

201.    The Director Defendants thus disregarded the known risks that generally inured in the investment advisory industry's compensation system, and the specific risks to Putnam posed by this system in the context of the Company's substantial decline in assets under management.   It was a classic case of leaving the fox to guard the henhouse.   Those who had something to gain by permitting select investors to market time were given the discretion to enforce, and thus the ability to override, the policies and procedures to police and prevent market timing that had been advertised to the market in the various Putnam fund prospectuses.   Exempting 401(k) plans from MTD oversight, combined with then failing to implement an alternate market timing oversight and tracking system for these plans -- only exacerbated these risks.

202.    The scope, magnitude and long history of major market timing activity at Putnam -- both in its 401(k) pension plans and among its own management personnel trading for their own accounts -- made substantially more egregious the Director Defendants' failure to take direct and effective action to control it.   As detailed herein, the market timing arrangements continued unchecked for several years -- and were only discontinued when outside regulators forced the Company to do so in late 2003.

203.    Relevant to the magnitude and scope of this problem at Putnam, a knowledgeable Putnam whistle blower testified to Congress that: "We knew all sorts of individual market timers *in many of the over 2000 [401(k)] plans we managed . . .*"   Describing the trading of only one of these pension plans, the Boilermakers, the MOSC found that over a three year period, at least twenty-eight

plan participants made anywhere from 150 to 500 trades, with total trading volumes in and out of only one fund, the Voyager fund, *amounting to approximately half a billion dollars*." (Emphasis added.)

204.    The existence of substantial market timing by 401(k) pension plan participants was well-known.  Putnam had performed an internal review of trading activities in the Voyager fund as early as March 2000, which resulted in the identification of specific market timing accounts, including the Boilermakers.  The MOSC found continued knowledge of the material increase in such market timing activities was further reflected in a series of e-mails over the next several years.

205.    In addition, regulators have made clear the "the volume of exchanges and amount of funds were material and would have certainly triggered one or more of the daily reports reviewed by the Putnam MTD," and likewise that "based on readily available NASDAQ trading data, it was apparent that the [JIBEW] participants were making frequent in-and-out trades."

206.    Yet, the Director Defendants had failed to take any action to ensure  that effective systems of communication would bring to their attention material information concerning the Company's compliance with its fundamental fiduciary duties to its mutual fund clients and the investors therein.  As alleged above, on numerous occasions, Putnam personnel questioned the propriety and advisability of continuing management's practice of overriding market timing prevention policies and procedures for favored investors.  Yet these questions were misdirected, flowing directly to sales and management personnel who had personal interests in increasing or maintaining assets under management at all costs.  In failing to take action to ensure that an adequate reporting system was in place, the Director Defendants failed to take into account one of the basic requirements of an effective compliance system under the Sentencing Guidelines : "having in place

and publicizing a reporting system whereby employees and other personnel could report [illegal] conduct by others within the organization without fear of retribution."

207.    These failures on the part of the Director Defendants were reckless, in that they consisted of failure to take action to protect the Company in the face of known risks, and was particularly egregious in light of the fact that the Director Defendants were aware that the decline in assets under management at Putnam resulting from changed market conditions had placed severe pressures on management and sales personnel at the Putnam.  In discussing the basic internal control component of risk assessment, the COSO Framework notes that "[a] changed . . . economic environment can result in increased competitive pressures and significantly different risks."  The COSO Framework makes clear that changed economic conditions, such as the substantial market decline and its effect on Putnam's assets under management in 2001 and 2002, constitute a "[c]ircumstance[] demanding special attention" in terms of assessing internal control and compliance risks at the Company.

208.    Moreover, the failure to take action to prevent or detect and eliminate Putnam's management's overrides of its market timing policing and prevention policies and procedures represents a breakdown in internal control for which the Director Defendants are entirely responsible.  The COSO Framework -- the universal standard for evaluating the effectiveness of financial reporting, operational, and compliance-directed systems of internal control, within the United States -- makes clear that only the Board (or the Audit Committee acting on its behalf) -- is in a position to act to address situations were management overrides internal control policies and procedures for improper purposes.  The Director Defendants' failure to take any action whatsoever to address the critical risk of management override -- particularly as market declines placed severe

79

performance stresses on MMC management -- constituted a reckless breach of the directors' duty to attend in good faith to their fundamental oversight duties.

## DAMAGES SUSTAINED BY PUTNAM
## AND MARSH & McLENNAN

209.    Putnam, and through Putnam MMC, have suffered substantial injury, both financial and reputational.

210.    On April 8, 2004, Putnam entered into settlement agreements with the SEC and MOSC.  In its settlement with the SEC, Putnam agreed to pay $5 million in disgorgement and a $50 million penalty.  In its settlement with the MOSC, Putnam agreed to pay an additional $5 million in restitution, and another $50 million penalty, and consented to the entry of a cease-and-desist order.  These payments, reported in MMC's consolidated statements of financial results and condition, harmed MMC and its shareholders by reducing the value of the enterprise and the interests of MMC's shareholders therein.

211.    The market timing scandal has severely damaged Marsh & McLennan's reputation, particularly that of Putnam, a circumstance that has caused and will continue to cause severe financial harm to Marsh & McLennan and its shareholders.  Specifically, there has been the massive exodus of investors from Putnam's mutual funds following public disclosures of this wrongful conduct.  For example, The Wall Street Journal reported on January 26, 2004, that:

> Assets in Putnam Investments mutual funds fell by $1.65 billion, or about 1%, to $161.5 billion in December as investors continued to withdraw money from the company in the wake of the mutual-fund scandal, according to fresh data from fund-tracker Lipper Inc.  Customer defections were steeper than the figure suggests because the stock market was up sharply during the month.  Net withdrawals from Putnam funds in December actually totaled about $6 billion, according to an estimate by Robert Adler, president of AMG Data Services.

Even so, the asset drop was far less severe than in November, when mutual-fund assets at the Boston fund company declined by $11.3 billion, according to Lipper. Due to the November defections, Putnam .has fallen one notch to become the sixth-biggest U.S. mutual fund company, according to Boston fund-tracker Financial Research Corp.

212.    Putnam's total revenue and income in 2003, as well as its percentage of totals for MMC, declined materially from the year prior.  Likewise, assets under management at Putnam decreased dramatically in the fourth quarter of 2003, a consequence MMC directly attributed to the adverse investor "reaction" -- i.e., redemptions from its mutual funds:

> Putnam's revenue decreased 8% in 2003, which reflects the effect of decreased assets under management and a decline in underwriting and distribution fees partially offset by higher investment income driven by investment gains from trading securities in 2003 and a favorable comparison to 2002, which included a charge for the decline in value of an available for sale security.  Assets under management averaged $258 billion in the year ended December 31, 2003, an 8% decrease from the $279 billion managed during the year ended December 31, 2002.  Assets under management aggregated $240 billion at December 31, 2003 compared with $251 billion at December 31, 2002. *The change from December 31, 2002 results primarily from net redemptions of $60.7 billion partially offset by an increase in equity market levels. The majority of the net redemptions occurred in the fourth quarter in reaction to the administrative proceedings by the Securities and Exchange Commission ("SEC") and other regulatory bodies.*  Putnam's future revenue and results of operations may be adversely affected by continued net redemptions and by the impact on revenue of limits on fund expense ratios and on front end sales charges announced by Putnam in late January 2004.  Assets under management at February 29, 2004 were $233 billion.

Company 2003 Form 10-K (Emphasis added.)  Both of these factors have resulted in substantial injury to Marsh & McLennan.

213.    In addition, despite Lasser's direct knowledge of the wrongdoing years prior to its revelation by regulators, and his ultimate ouster from the Company in early November, 2003,  Marsh & McLellan ultimately paid him $78 million to resolve what <u>The Wall Street Journal</u> described as

"a bitter dispute in which Putnam challenged his severance pact, claiming he was responsible for lapses that led to civil charges last fall in the mutual-fun scandals."  The article went on to note:

> The company said it amounted to $25 million less than the company earlier had set aside for Mr. Lasser's pay.  ...  In addition, he [Lasser's attorney] said Putnam agreed to drop its claim that Mr. Lasser has been 'terminated for cause,' an assessment that could have done further damage to Mr. Lasser's career.

214.    Further, the SEC and state regulatory investigations have cost Marsh & McLennan millions of dollars in professional fees and other defense costs, and the settlements, including their provisions for fund board turnover and revamped mutual fund compliance systems, will require additional expenditures that would not have been incurred but for the defendants' breaches of duty as alleged herein.

215.    Finally, Marsh & McLennan faces massive civil liability to mutual fund investors and others as a result of the breaches of duty alleged herein.  The total liabilities from the numerous legal actions which have been brought against the Company have not yet ben determined, but will likely run into the hundreds of millions of dollars.

216.    All told, Marsh & McLennan and its shareholders have been massively harmed by the breaches of duty alleged herein.

## **DEMAND FUTILITY**

217.    Plaintiff brings this action derivatively in the right and for the benefit of MMC to redress injuries suffered and to be suffered by MMC as a direct result of the Director Defendants' breaches of fiduciary duty alleged herein.  Plaintiff will adequately and fairly represent the interests of MMC and its shareholders in enforcing and prosecuting their rights and has retained counsel who are competent and experienced in litigating derivative actions.

218.     Plaintiff did not make a pre-suit demand upon the Board of Directors to bring this action because such demand would be futile.

219.     Demand is excused because all of the Director Defendants face a substantial likelihood of liability on the claims asserted herein, creating a reasonable doubt that they could consider a demand in a disinterested and independent manner.

220.     Director Defendants Coster, Davis, Lasser, Olsen, Cabiallavetta, Groves, Greenberg and Smith are all current or former executive officers of the Company and/or its constituent businesses.  As a result of their professional training and experience, and also as a result of years of professional familiarity with internal policies, procedures, and practices at MMC and its constituent businesses, these Director Defendants have special skill, knowledge and expertise that they are duty-bound to use to the best of their ability, in their roles as directors, for the benefit of MMC and its stockholders.  In particular, these directors understand the special responsibilities, and attending compliance risks, of operating a business heavily dependent on fiduciary duties owed to third parties, such as mutual fund investors, asset management clients, and insurance brokerage clients. Evidencing this is the fact that in fiscal 2003, MMC derived $8.8 billion (or over 75%) of its approximately $11.6 billion in revenues from its investment management and insurance brokerage businesses.

221.     Director Defendant Greenberg, as Chairman and CEO of MMC, has full familiarity with and responsibility for MMC's systems of internal control, including its policies and procedures for providing assurance that all operations of the Company and its operating subsidiaries are conducted in a manner that is fully compliant with all applicable laws, regulations, and standards of conduct, including fiduciary duties owed to third parties by MMC and its operating subsidiaries.

Furthermore, Greenberg has extensive professional and executive management experience in both: (i) insurance brokerage (having served from 1991 to 1995 as executive vice president, with responsibility for the domestic brokerage group of AIG); and (ii) asset and investment management (having served as Chairman of MMC Capital, Inc., MMC's private investment management business). These professional experiences impose an awareness on Greenberg's part of the special compliance risks attendant to operating in highly regulated lines of business involving heightened fiduciary responsibilities and obligations.

222. Director Defendant Lasser, who, on information and belief resigned from the MMC Board shortly after the filing of the original Complaint in this action, served as President and CEO of Putnam, a position he held since 1985, for a total of 18 years. As such, Lasser has intimate familiarity with Putnam's systems of internal control, including its policies and procedures for providing assurance that all operations of the company and its operating subsidiaries are conducted in a manner that is fully compliant with all applicable laws, regulations, and standards of conduct, including fiduciary duties owed by Putnam and its operating subsidiaries to third parties such as the Putnam-managed mutual funds. His expertise in this area comes not only from his executive capacity on the investment management side, but also from his role as a member of the board of trustees of over 100 Putnam-managed funds.

223. Lasser joined Putnam in 1969, and thus has over three decades of experience and familiarity with the mutual fund industry and key regulatory issues affecting that industry with Putnam's operations. Lasser also served, until very recently, as a member of the Executive Committee of the Board of Governors of ICI, the chief industry group representing 95% of the mutual fund industry. Thus, Lasser was at Putnam when it sought the SEC's no-action position on

fair value pricing in 1981, and was on the ICI Board of Governors when it received both the 1999 and 2001 SEC No-Action Letters. There can therefore be no doubt that Lasser was aware of the threat of dilution to long-term mutual fund investors posed by market timing.

224.     Beyond dispute, Lasser was at all relevant times keenly aware of the importance of avoiding even the appearance of impropriety in the fiduciary-based mutual fund management industry, going so far as to publicly state in a 1999 interview that: "It's very important that the mutual-fund industry hold itself so beyond reproach that, really, nothing can touch it."

225.     Director Defendant Davis, Vice Chairman of MMC, also has direct and intimate familiarity with the fiduciary nature of asset management businesses. He is Chairman and CEO of MMC Capital, and, prior to his service in these roles, served as President of MMC Capital. Davis moreover has a high level of experience and expertise in the financial services industry, having previously served as head of investment banking services worldwide at Goldman Sachs.

226.     Director Defendant Olsen joined MMC in 1997 as Vice Chairman, a role he held until the end of that year. He joined the Company as a result of its 1997 acquisition of Johnson & Higgins, which at that time was the leading privately held insurance brokerage firm in the world. In addition to brokerage services, Johnson & Higgins provided sophisticated risk management and benefit consulting services to clients worldwide through the firm's global network of almost 9,000 employees and 145 offices in major business centers around the world. Olsen was CEO of Johnson & Higgins, and thus had extensive high-level executive management experience in the fiduciary insurance brokerage business, and, through Johnson & Higgins's expertise in risk management consulting, had a sophisticated understanding of risk management principles bearing upon, inter alia, operational risk management and compliance issues. As a director of MMC, Olsen was duty-bound

85

to bring to bear all of his experience, knowledge and expertise for the benefit of MMC and its shareholders.

227.    Director Defendant Cabiallavetta, Vice Chairman of MMC and Chairman of MMC Global Development, also has extensive senior executive management experience in fiduciary businesses, having previously served as Chairman of the Board of UBS, AG, one of Europe's leading banking institutions.  Prior to his service as chairman at UBS, Cabiallavetta served as head of its trading and risk management department. In these roles, he learned through experience the importance of effective risk management and strong internal control, having presided over massive losses exceeding $420 million from equity derivatives trading reported by UBS in 1998.

228.    In addition, Cabiallavetta is a past member of the board of the Swiss National Bank and the International Capital Markets Advisory Committee of the Federal Reserve Bank. He also served as a Vice Chairman of the Board of Directors of the Swiss Bankers Association. While Cabiallavetta joined the Company's board and executive management team in 1999, he had served on MMC's International Advisory board since 1993, and thus has long standing and intimate familiarity with the Company and its operations.

229.    Defendant Director Groves, an MMC director since 1994, was named CEO of Marsh, Inc. -- MMC's insurance brokerage and risk management subsidiary -- in January 2003, and had served as President and COO of Marsh, Inc. from October 2001 until January 2003. Prior to joining MMC, Groves was Chairman of Legg Mason Merchant Banking, Inc., a position he held since 1995. In addition, Groves retired in 1994 from Ernst & Young, where he held numerous positions over the course of a 37 year career, including spending the last 17 years as Chairman and Chief Executive Officer.

230.     As such, Groves has broad experience and is a highly sophisticated executive.  His experiences as CEO of both Marsh and of Ernst & Young provide an extraordinary depth of expertise in the specialized fields of risk management and compliance, both from the standpoint of an adviser and as an chief executive responsible for overall enterprise compliance.  Groves was duty-bound to bring to bear all of this experience, knowledge and expertise for the benefit of MMC and its shareholders.

231.     Defendant Director Smith retired in 2000 as Chairman of the Board of MMC, a position he held since 1992.  In addition, he served as Chief Executive Officer of MMC from 1992 to 1999.   In addition, for the last ten years, Smith has continuously served as a trustee of various mutual funds managed by Putnam Investment Management, LLC.  Smith was thus intimately familiar with all of MMC's policies and procedures relating to internal control and compliance.  Additionally, as a result of his service on as many as 100 Putnam mutual fund boards, Smith was intimately familiar with all issues relating to investment company and investment adviser conflicts of interest and compliance, and, in particular, with Putnam's policies and procedures relating to these matters.

232.     Director Defendants King, Olsen, Fanjul, Hardis, Schapiro and Simmons served on MMC's Audit Committee.  The Audit Committee has met regularly over the preceding several years, including ten times in 2003, nine times in 2002, seven times in 2001, six times in 2000, and seven times in 1999.  MMC's Audit Committee is specifically charged with responsibility for "oversight of the system of internal control established by MMC management."

233.     Director Defendants Erburu, Lang, King and Schapiro served on MMC Directors and Governance Committee.  This Committee met twice in 2002 and six times in 2003.  MMC's

87

Directors and Governance Committee are specifically charged with responsibility for the development, review and periodic reassessment of MMC's corporate governance principles and the recommendation of proposed changes to the board.

234.    According to the 1992 "Internal Control -- Integrated Framework," published by the Committee of Sponsoring Organizations of the Treadway Commission, which is the accepted standard for defining and assessing the effectiveness of the internal control of organizations in the United States, "internal control" is defined as follows:

> Internal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories:
>
> •    Effectiveness and efficiency of operations.
> •    Reliability of financial reporting.
> •    *Compliance with applicable laws and regulations.*

Emphasis added.

Thus,  the MMC Audit Committee was specifically responsible for oversight of compliance by MMC and its operating subsidiaries with applicable laws and regulations.

235.    Several of the Audit Committee members have special skill, knowledge and experience that they were duty bound to bring to bear, in their roles as directors and members of the Audit Committee, for the benefit of MMC and its shareholders.

236.    Director Defendant Schapiro has served for several years on the boards of trustees for the WM Group of Funds, mutual funds managed by a subsidiary of Washington Mutual Bank, the nation's largest thrift.  As an experienced mutual fund trustee, Schapiro is thus intimately familiar with: (i) the conflicts of interest and compliance issues faced by investment companies and investment advisers, including issues of fair value pricing, market timing, and late trading; (ii) the

fiduciary duties owed by investment advisers to the investment companies they serve; and (iii) the pervasive regulation applicable to the mutual fund management business. Schapiro was particularly specially equipped to oversee the internal controls and compliance activities of Putnam, MMC's principal investment management operating subsidiary. Schapiro was duty bound to use his special knowledge, in his role as an MMC director and member of the Audit Committee, for the benefit of MMC and its shareholders, including being duty bound to apply all of his knowledge and experience and make rigorous inquiry of Putnam compliance matters on behalf of MMC and its shareholders.

237.    Director Defendant Olsen, as noted above, through his prior services at Johnson & Higgins, had extensive, high-level executive management experience in the fiduciary insurance brokerage business, and through Johnson & Higgins's expertise in risk management consulting, a sophisticated understanding of risk management principles bearing upon, among other things, operational risk management and compliance issues.

238.    Director defendant Fanjul is Vice Chairman and Chief Executive Officer of Omega Capital, a private investment firm in Spain. He was also Chairman of N.H. Hotels from 1997 until 1999, and of Hidroelectrica del Cantabrico from 1999 to 2001. Fanjul is also Honorary Chairman of Repsol, S.A., where (from its creation in 1986 until 1996) he served as Chairman and Chief Executive Officer. In addition, Fanjul is a director of Acerinox, Tecnicas Reunidas and the London Stock Exchange, and acts as an advisory director of Unilever. He is also an International Advisor to Goldman, Sachs & Co., a member of the International Advisory Board of both MMC and The Chubb Corporation, and a member of the European Advisory Board of the Carlyle Group. Pursuant to his broad senior executive management experience, Fanjul has developed and acquired special

knowledge, skill and experience that he was duty-bound to bring to bear on his role as a MMC director and member of the Audit Committee, for the benefit of MMC and its shareholders.

239.    Director Defendant Hardis is Chairman of Axcelis Technologies, Inc.  Prior to his retirement in 2000, Hardis also served as Chairman and Chief Executive Officer of Eaton (where he has worked since 1979).  In addition, Hardis is a director of American Greetings Corporation, Apogent Technologies Inc., Lexmark International Corporation, Nordson Corporation, Progressive Corporation and Steris Corporation.  Hardis is designated as the Audit Committee "financial expert" in MMC's latest proxy statement.  As a result of his substantial senior executive management experience (including several years' experience as CEO of Eaton Corp., a position pursuant to which he held ultimate management responsibility for that company's systems of compliance) and financial expertise, Hardis has special knowledge, skill and expertise that he was duty-bound to bring to bear in his role as an MMC director and member of the Audit Committee, for the benefit of MMC and its shareholders.

240.    Finally, each member of the Audit and the Directors and Governance Committees was aware of the special experience, knowledge and skill of each other committee member, and the committee as a whole was duty bound to draw upon such special knowledge, skill and experience to assure that it was rigorously and effectively performing its internal control and compliance oversight role.  In particular, to be assured that oversight of Putnam compliance was effectively overseen, the Audit and the Directors and Governance Committees should have drawn upon Director defendant Schapiro's mutual fund oversight expertise, upon Olsen's risk management and senior executive management expertise, and upon Fanjul's and Hardis's financial and senior executive management experience.

90

241.    All of the Director Defendants had both general and direct notice of specific events and occurrences that revealed the clear and essential requirement for rigorous scrutiny of compliance by Putnam and its professional personnel.  MMC had been in the investment management business since 1970, when it acquired Putnam.   Thus, the MMC board has long familiarity with the mutual fund management industry, and with the inherent conflicts of interest posed due to the basic structure of the industry, more fully described above.

242.    In addition to such general notice, members of the Board of MMC also received multiple, clear warnings of both potential and actual misconduct within Putnam that reasonably put them on direct notice of potential conflicts of interest and breaches of fiduciary duty.  For example, as reported in The Wall Street Journal in August 1997, the former chief of compliance at Putnam had filed suit against the company, alleging, among other things, improper personal trading -- known as "front running" -- by senior Putnam fund managers.  As the Journal article made clear, front running is illegal, and represents a material and serious conflict of interest and plain breach of fiduciary duty. These matters reasonably came to the attention of the MMC directors at the time of the suit, and also as a result of The Wall Street Journal report.

243.    Director Defendants Bernard, Erburu, Groves, Greenberg, Lang, Simmons, Coster, Lasser, Olsen and Smith were all MMC Board members at this time.  These serious allegations, raised by the chief compliance officer at Putnam, put each of these director defendants on direct notice that rigorous and ever-vigilant scrutiny of compliance at Putnam was absolutely essential to protect MMC and its shareholders from substantial liability and the potential financial impact to MMC -- resulting from both regulatory action and reputational harm  in the market place -- that

91

could befall Putnam, and thus, consequently, MMC, in the event of failure to detect and prevent improper trading by Putnam investment professionals.

244.    Members of MMC's Board received another clear red flag warning regarding the adequacy and reliability of Putnam's control personnel and systems in March 2001, when <u>Bloomberg</u> reported that Paul Murphy, Vice President of Putnam's Control Division, had been convicted of conspiracy for plotting to illegally transfer Putnam funds. Although this particular red flag did not involve improper trading practices, it raised cause for concern and inquiry into the systems overseeing and monitoring the honesty and integrity of key personnel in a department crucial to internal control and compliance at Putnam.

245.    Also as detailed above, MMC controlled Putnam in 1981 when it sought the SEC's no-action position regarding the imposition of fair value pricing of international funds, and thus has specific and long familiarity with the dilutive effects on long-term mutual fund investors of net asset value arbitrage, and, ironically, of the single most effective tool for combating such dilution.

246.    Over time, the importance of Putnam to MMC's overall financial results continued to climb substantially. By fiscal year 2000, Putnam was MMC's highest-margin business, contributing $3.2 billion (or almost one third) of MMC's total $10.157 billion in revenue, and nearly half ($1.027 billion) of MMC's total of $2.179 billion in operating income. MMC's Board was thus fully cognizant that a huge portion of the Company's revenues and earnings were concentrated in the highly regulated investment advisory business of its crucial Putnam operating subsidiary. With the MMC Board's collective experience in risk management, the Defendant Directors were plainly aware of the crucial importance of maintaining and closely monitoring compliance risks at Putnam. The recent attempts of MMC and its Board members to lay total blame on Lasser, and to disclaim

any knowledge and responsibility on their own part, for Putnam's failure to detect and prevent obvious and apparent market timing in Putnam-managed funds is neither factually credible nor legally supportable.

247.    Given the importance of Putnam to MMC, the specific experience of key director defendants in risk management and the investment advisory business, and the incontrovertible knowledge and awareness of the problems and issues with market timing and late trading on the part of the MMC directors, the MMC board was fully aware of the risk of harm to long-term mutual fund investors from traders seeking to exploit arbitrage opportunities presented by stale pricing of mutual fund portfolio assets.  This risk was manifest due to numerous red flags, including, inter alia: (i) the 1981 Putnam No-Action Letter; (ii) the events surrounding the October 1997 Asian market crash and Fidelity and T. Rowe Price's application of fair value pricing to protect long-term investors (all of which were extensively reported in the press and discussed in the industry); (iii) the SEC study that followed the October 1997 Asian market crash and the wide press reporting and industry discussion of that study; (iv) numerous academic and trade press articles documenting the arbitrage opportunity represented by stale pricing in mutual funds and the harm that frequent trading to exploit such opportunities imposed upon long-term mutual fund investors in terms of dilution and increased transaction costs; (v) the 1999 and 2001 SEC No-Action Letters to the Investment Company Institute, which further discussed the obligation of funds to utilize fair value pricing to protect long term investors; and (vi) the industry-wide adoption of various measures designed ostensibly to detect and prevent such arbitrage-motivated trading, including limits on trading frequency, short-term redemption fees, expanded use of fair value pricing, and other measures.

248.    Despite and in the face of all of this knowledge, and despite the fact that they were on notice of serious past trading violations by Putnam fund managers and defalcations by key Putnam control employees, the Director Defendants recklessly failed to make adequate inquiry and/or take appropriate action to ensure that serious violations of Putnam's Code of Ethics and of fiduciary duties would be recognized, tracked and, ultimately, reported through appropriate channels with notice to either the MMC Audit Committee or full MMC board.  A March 2003, investigative report in The Wall Street Journal disclosed that approximately 40 current and former Putnam employees had been issued "warnings" about rapid trading in Putnam funds between 2001 and 2003; however, these serious violations not only failed to result in any effective preventive or disciplinary measures being taken, they also apparently never came to the attention of the MMC board or the Audit or Directors and Governance Committees.

249.    Instead of ensuring that effective compliance reporting and corrective action was built into MMC's system of internal controls, by their reckless disregard of known risks and specific past similar violations, the MMC Director Defendants instead allowed a culture to persist at Putnam that placed profits before fiduciary duties and compliance, resulting in multiple arrangements being made with Taft-Hartley 401(k) pension plan participants that resulted in wide-spread market timing by union officials in exchange for potential additional asset management business, and allowing key portfolio managers to persist in improper market timing of their own funds, year after year.

250.    The wrongful acts and omissions at issue constitute violations of law resulting from the Individual Defendants' bad faith, knowing and reckless failure to take effective action to protect the Company and its shareholders by ensuring its, as well as its key operating subsidiaries' compliance with applicable legal and regulatory requirements.  Such conduct is thus not subject to

the protection of the business judgment rule, nor are the Individual Defendants protected from personal liability for such bad faith misconduct by virtue of any exculpatory provision in the Company's certificate of incorporation.

251.    As a result of the Defendant Directors' bad faith and reckless breach of fiduciary duty, the Company and its shareholders have suffered, and will further suffer, massive financial harm.

252.    For all of these reasons, all of the Defendant Directors face a substantial likelihood of liability on the claims asserted in this action, making them materially interested with respect to consideration of a pre-suit demand. Accordingly, such demand would be futile, rendering pre-suit demand excused for the purposes of this derivative action.

253.    Moreover, to the extent that the Company presently maintains or previously maintained officers' and directors' liability insurance coverage, that insurance would be the primary or principal source of any recovery against the defendants, and would be rendered void if the Company commenced proceedings against the Individual Defendants, as these policies uniformly contain provisions which void coverage if the Company brings suit in its own name. For this reason also, demand is excused.

## COUNT I

### Derivative Claim Against The Director Defendants
### for Breach of Fiduciary Duty

254.    Plaintiff realleges and incorporates by reference each and every allegation contained above.

255.    The Director Defendants are fiduciaries of the Company and of all of its public shareholders, and owe to them the duty to conduct the business of the Company loyally, carefully,

diligently, prudently, and in good faith.  This cause of action is asserted based upon the Director

Defendants' acts in violation of applicable state and common law, which constitute breaches of their

fiduciary duties.

256.    The Director Defendants breached their fiduciary duties, including the duties of good

faith and care to MMC and its shareholders, by not only failing to act as an ordinarily prudent person

would have acted in a like position, but also by acting intentionally and/or with gross recklessness

and in conscious disregard of their responsibilities to act in the best interests of MMC.

257.    Director Defendants Coster, Davis, Lasser, Olsen, Cabiallavetta, Groves, Greenberg

and Smith each have substantial experience in the investment management and/or financial services

industries, giving them knowledge and expertise that they were obligated to use for the benefit of

MMC and Putnam Management in their roles as directors of MMC.  Given their substantial industry

experience, knowledge and expertise, their failure to prevent the illicit market timing arrangements

alleged above constitutes a reckless breach of the duties of good faith and care.

258.    As a result of the Director Defendants' wrongful conduct and actions, MMC has

suffered and will continue to suffer considerable damage.

259.    The Director Defendants, singly and in concert, engaged in the aforesaid conduct in

the intentional breach and/or in reckless disregard of their fiduciary duties to the Company and

conspired to, and did abuse the control vested in them.

260.    By reason of the foregoing, the Director Defendants have breached their fiduciary

duties to MMC and its shareholders.

261.    MMC and its shareholders have thus been injured by reason of the Director

Defendants' intentional and/or reckless disregard of their fiduciary duties.

## COUNT II

### Derivative Count Against the Officer Defendants
### Breach of Fiduciary Duty

262.    Plaintiff realleges and incorporates by reference each and every allegation set forth above.

263.    The Officer Defendants are fiduciaries of the Company, and owe to it the duty to conduct the business of the Company loyally, carefully, diligently, prudently, and in good faith. This cause of action is asserted based upon the Officer Defendants' acts in violation of applicable state and common law, which constitute breaches of their fiduciary duties.

264.    The Officer Defendants breached their fiduciary duties, including the duties of good faith and loyalty to MMC, by not only failing to act as an ordinarily prudent person would have acted in a like position, but also by acting intentionally and/or with gross recklessness and in conscious disregard of their responsibilities to act in the best interests of MMC.

265.    Both of the Officer Defendants have substantial experience in the area of investment management, giving them knowledge and expertise that they were obligated to use for the benefit of MMC and Putnam Management in their  roles as senior executives and mutual fund portfolio managers at Putnam Management.  Given their substantial industry experience, knowledge and expertise, including of the structural conflict of interest inherent in the mutual fund industry, their repeated and intentional market timing transactions detailed above constituted an intentional and/or consciously reckless breach of the duties of good faith and loyalty.

266.    As a result of the Officer Defendants' wrongful conduct and actions, MMC has suffered and will continue to suffer considerable damage.

267.   The Officer Defendants, singly and in concert, engaged in the aforesaid conduct in the intentional breach and/or in reckless disregard of their fiduciary duties to the Company and conspired to, and did abuse the control vested in them.

268.   By reason of the foregoing, the Officer Defendants have breached their fiduciary duties to MMC.

269.   MMC has thus been injured by reason of the Officer Defendants' intentional and/or reckless disregard of their fiduciary duties.

**WHEREFORE**, plaintiff demands relief on behalf of MMC as follows:

A.   Judgments against each of the Individual Defendants for damages in favor of plaintiffs, on behalf of MMC and its public shareholders, and awarding punitive and exemplary damages as appropriate, plus pre-judgment interest;

B.   Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, so as to assure that plaintiff and MMC have an effective remedy;

C.   Contribution from the Defendants named in the above Counts;

D.   An award to plaintiff of the costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

E.   An award to plaintiff of such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all such issues which are triable before a jury.

Dated: September 29, 2004.

**MORRIS AND MORRIS LLC**
**COUNSELORS AT LAW**

By: _____/s/_____

    Karen L. Morris
    Patrick F. Morris
1105 N. Market Street, Suite 803
Wilmington, DE 19801
Telephone: 302-426-0400
Facsimile: 302-426-0406

Lead Parent Derivative Counsel

**OF COUNSEL:**

**LAW OFFICES**
**BERNARD M. GROSS, P.C.**
Deborah R. Gross
Robert P. Frutkin
1515 Locust Street, 2nd Floor
Philadelphia, PA 19102
Telephone: 215-561-3600
Facsimile: 215-561-3000

**BULL & LIFSHITZ LLP**
Joshua Lifshitz
18 East 41st Street
New York, NY 10017
Telephone: 212-869-9449
Facsimile: 212-869-5632

**LAW OFFICE KENNETH A. ELAN**
Kenneth A. Elan
217 Broadway, Suite 606
New York, NY 10007
Telephone: 212-619-0261
Facsimile: 212-385-2707

**LASKY & RIFKIND, LTD.**
Leigh R. Lasky
100 Park Avenue, 12th  Floor
New York, NY 10017
Telephone: 212-907-0800
Facsimile: 212-684-6083

**PASKOWITZ & ASSOCIATES**
Laurence Paskowitz
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: 212-685-0969

## <u>CERTIFICATE OF SERVICE</u>

I, Patrick F. Morris, hereby certify that on September 29, 2004, I caused a copy of

**VERIFIED AMENDED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY**

**DUTY** to be served via e-mail on the following:

Stephen Greiner
Wilkie Farr & Gallagher LLP
sgreiner@wilkie.com

Sarah Herlihy
Mintz, Levin, Cohn, Ferris, Glovsky and .
Popeo, P.C.
S.herlihy@mintz.com

Daniel Pollack
Pollack & Kaminsky
dapollack@pollacklawfirm.com

Karen Kaiser
Pollack & Kaminsky
kikaiser@pollacklawfirm.com

Robert Eccles
O'Melveny & Myers LLP
beccles@omm.com

Matthew Eastus
O'Melveny & Myers LLP
meastus@omm.com

John A. D. Gilmore
Piper Rudnick LLP
john.gilmore@piperrudnick.com

Kirsten M. Nelson
Piper Rudnick, LLP
kirsten.nelson@piperrudnick.com

_____/s/_____
Patrick F. Morris